Pamela S. PREDICK and George Predick, Plaintiffs-Respondents,

v.

Margaret O'CONNOR, Defendant-Appellant.†
[Case No. 02–0503.]

Tina M. BUSCH, Petitioner-Respondent,

v.

Margaret O'CONNOR, Respondent-Appellant.†
[Case No. 02–0504.]

Court of Appeals

*Nos. 02–0503, 02–0504. Submitted on briefs October 28, 2002.
—Decided January 22, 2003.*

2003 WI App 46

(Also reported in 660 N.W.2d 1.)

† Petition to review denied 4-22-03.

On behalf of the defendant-appellant and the respondent-appellant Margaret O'Connor, the cause was submitted on the briefs of *Raymond D. Jamieson* of

*Cook & Franke S.C.* of Milwaukee and *Micabil Diaz* of the *American Civil Liberties Union of Wisconsin Foundation*.

On behalf of the petitioner-respondent Tina M. Busch and the plaintiffs-respondents Pamela S. Predick and George Predick, the cause was submitted on the briefs of *Thomas J. McClure* of *McClure Law Offices S.C.* of Delafield.

Before Nettesheim, P.J., Brown and Anderson, JJ.

¶ 1. BROWN, J. At first blush, an order banishing a person from a county seems like it was taken from the script of some old Grade-B cowboy movie where the sheriff tells the bad guy to "get out of Dodge." The knee-jerk reaction is that this kind of order is arbitrary at the very least and an invasion of a person's constitutional right to travel at the most. When applied to the facts in these two harassment actions, however, the orders make a lot of sense. Margaret O'Connor twice used her automobile as a dangerous weapon, once running Tina M. Busch off the road while Tina was driving both her daughter and Pamela and George Predick's daughter to soccer practice, and once attempting to "side swipe" Pamela while Pamela was jogging.[1] Margaret has been stalking these people for a decade and has ignored previous orders to cease and desist from her behavior. She has expressed no remorse and exhibits no inclination to discontinue her dangerous fixation on the people she torments. The trial court determined that because of O'Connor's past utter disregard for less intrusive orders and because of her use

---

[1] We note that there are three victims in this case, two of whom are married and share the same last name. We will refer to the parties by their first names for the sake of clarity.

of a vehicle as a dangerous weapon, O'Connor's victims needed a "zone of protection." We hold that banishment from Walworth county was a proper exercise of discretion because it may finally keep the tormentor at bay. We affirm.

¶ 2. While the salient facts of this case revolve around the two instances in which Margaret used her vehicle to harass Tina and Pamela, we set forth in detail the factual history of this case in order to demonstrate how the trial court has attempted to implement more narrowly tailored orders and why they have failed to prevent Margaret's continuous harassment. The facts of this case stretch back to approximately 1991 when Pamela and Margaret, whose mother lives across the street from the Predicks in the City of Delavan, became neighbors and acquaintances. At her deposition in 1998, Pamela testified that sometime after the parties became acquainted and had socialized on a few occasions, Margaret began to call and harass her, her family and many of her friends several times during both day and nighttime hours. Pamela also testified that on at least one occasion Margaret had approached and pushed her in front of one of her children. In her deposition, Margaret justified her past actions by claiming that she and Pamela had been in a romantic relationship.[2] According to Pamela's testimony, Margaret's actions resulted in a two-year restraining order being issued against Margaret in 1994.

¶ 3. Pamela also testified at her deposition, and then again at a later hearing, that sometime in 1995 she

___

[2] We note that the trial court determined that it was unlikely that such a relationship existed between Pamela and Margaret. Further, we point out that the existence of the relationship is irrelevant for our purposes, as it would not have entitled Margaret to consistently harass Pamela and her family.

326

had gone jogging and a car driven by Margaret came at her at a high rate of speed such that she was forced to jump off to the side of the road to avoid getting hit. Pamela stated that Margaret then slammed on the brakes, exited the vehicle and reached into the rear of the car. Pamela testified that she feared for her safety and she had to run as fast as she could in order to get away. At the hearing, Margaret denied running Pamela off the road and testified that all she had done that day was pass by her in her car.

¶ 4. In 1997, after the expiration of the first restraining order, the Predicks commenced another action against Margaret, seeking a second harassment injunction. The parties entered into a stipulation and order pursuant to which the trial court issued a harassment injunction against Margaret. In December 1997, the Predicks filed a complaint alleging defamation and intentional infliction of emotional distress and asserting a claim for punitive damages.[3] The Predicks alleged that Margaret had continued to harass them by both telephoning and threatening them, their friends, their family and their co-workers during all hours of the day and night. Margaret admitted making the calls to Pamela's co-workers and to contacting the Predicks, but denied contacting Pamela's family and making many of the alleged statements. Margaret once again justified her conduct by asserting that at one time Pamela had initiated an intimate relationship with her.

¶ 5. In 1999, the parties resolved the dispute by entering into a stipulation and order imposing a permanent injunction on both parties. The stipulation and order required the Predicks to refrain from contacting,

---

[3] The Predicks later amended their complaint in 1998, changing the first count from defamation to libel and slander.

harassing or interfering with the lives of Margaret and her mother. The stipulation and order further required Margaret to pay the Predicks $4000 and barred her from, inter alia, contacting, harassing and interfering with the Predicks, members of their family, and their medical providers, utility companies and co-workers.[4] The agreement was to extend throughout Margaret's lifetime and provided that if she violated the agreement, the court could impose a fine of up to $1000 and imprisonment not exceeding ninety days.[5]

---

[4] In their complaint, the Predicks alleged that Margaret had contacted Pamela's doctor and co-workers at her business, and after gaining access to the Predicks' telephone billing records, had made a series of phone calls to their family and friends.

[5] The agreement, in pertinent part, read as follows:

8. Upon approval of the Court, [Margaret] shall be enjoined and restrained from doing any of the following actions for the purpose of contacting, harassing or interfering in any way with the Predicks:

a. Having any contact with the Predicks, including [the enumerated family members], in any fashion, including but not limited to, by telephone, by letter or in person at their homes or the family members' homes, at school and/or at places of employment.

b. Contacting the Predicks and [the enumerated family members], physicians or medical personnel of any kind or nature whatsoever, current and future places of employment, including, but not limited to, S. Abraham & Sons and Burr Oak Manor.

c. Contacting directly or indirectly any utility service, telephone service, mail delivery and other similar services of the Predicks or [the enumerated family members], except as to a party's own particular account with these institutions.

d. Stalking, spying or harassing the Predicks or [the enumerated family members].

¶ 6. In the fall of 2000, the Predicks filed several pleadings with the trial court, alleging that Margaret had not complied with the 1999 stipulation and order. In August 2001, the trial court found Margaret in contempt of court for violating the stipulation and order by intentionally threatening in a telephone conversation with the Predicks' attorney that she would have video surveillance conducted against the Predicks and by contacting an acquaintance of both the Predicks and Margaret and inferring in the conversation that the "Predicks were in trouble." The court further found that the phone calls served no legitimate purpose and were meant to harass the Predicks. The court ordered Margaret to serve ninety days in jail, but gave her the opportunity to purge the contempt. According to the purge conditions, Margaret was to: (1) pay $2000 to the Predicks, (2) have absolutely no future contact with the Predicks, (3) comply with all prior court orders in place, and (4) not call anyone or mention the Predicks' names to anyone other than her counsel. The court then added penalties for noncompliance.

¶ 7. In October 2001, the Predicks filed an order to show cause, alleging that Margaret was in contempt of the order. After a hearing on the matter, the court concluded that Margaret had violated the order for two reasons. First, the court found that Margaret had violated the previous orders barring contact with members of the Predick family. The court found that Margaret, in her rental car, had followed Tina, who at the time was driving her daughter and the Predicks' daughter to soccer practice. The court found that Margaret drove up to Tina's car and gesticulated and yelled obscenities at her, scaring everyone in the car. The court further found that in an attempt to drive Tina off the road, Margaret had forced her into the oncoming lane of

traffic, endangering all of the passengers in the vehicle. We note that in a prior hearing the court had observed that Margaret had chosen to harass Tina because she had become convinced, in the absence of any evidence, that Pamela and Tina were lovers and consequently had come to view Tina as a rival for Pamela's affections. Second, the court found that Margaret had on numerous occasions violated the purge conditions in the August 2001 order, which barred her from uttering the Predicks' names in the presence of anyone other than her counsel, by leaving numerous after-hours voice messages of an unreasonable and harassing nature on the office voicemail of the Predicks' counsel. The court further found that the calls were abusive and Margaret used personally derogatory language toward the Predicks and their counsel. The court counted 141 times that Margaret had mentioned the Predicks in the voice messages. According to the court, the calls bore no resemblance to the reasonable pursuit of her case. The court then imposed remedial sanctions and additional purge conditions, among them a condition prohibiting Margaret from entering Walworth county. Margaret then filed a motion to modify the purge conditions, which the court subsequently denied.

¶ 8. In October 2001, in response to the incident in which Margaret allegedly attempted to drive her off the road, Tina, who is Pamela's business partner, also filed a petition for a harassment injunction against Margaret pursuant to WIS. STAT. § 813.125 (1999–2000).[6] Margaret failed to appear, and, based upon the testimony given in the Predicks' case, the court granted Tina a default judgment against Marga-

---

[6] All references are to the 1999–2000 version of the Wisconsin Statutes unless otherwise noted.

ret and an injunction prohibiting Margaret from entering Walworth county, with limited exceptions for court appearances. The court ordered that Margaret have "no contact of any type at any place petitioner(s) may be. No contact through any third person of petitioner(s) on behalf of respondent. Court also will order her (respondent) not to be in Walworth County unless she is here for a court appearance or on her way to court." The court denied Margaret's subsequent motion to reconsider the civil injunction.

¶ 9. Margaret appeals from the trial court orders from both of the cases prohibiting her from entering Walworth county and denying her motions for reconsideration. These appeals were consolidated and we address them both here.

¶ 10. This appeal requires us to apply a two-part standard of review. Whether the trial court's orders violated Margaret's constitutional rights is a question of law. We review questions of law without deference to the decisions of the lower court. *Ball v. Dist. No. 4, Area Bd. of Vocational, Technical and Adult Educ.*, 117 Wis. 2d 529, 537, 345 N.W.2d 389 (1984). However, we will not overturn the trial court's findings of fact in either of the proceedings unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2).

¶ 11. Margaret seems to argue that banishment is a per se violation of constitutional rights and that a court should not have the authority to impose it. She cites to numerous cases from other jurisdictions that at first glance would appear to hold that banishment is presumptively invalid. While as a matter of course we do not normally engage in a lengthy discussion of cases from foreign jurisdictions, we believe it is important to do so here. A closer inspection of the facts and circum-

stances of the cases will reveal why the courts in fact chose to invalidate the banishment conditions before them.

¶ 12. In several of the cases, the courts determined that while they might have the authority to banish an individual from a geographic area, the facts and circumstances of the case did not support the imposition of the restriction. In *State v. Doran*, 95 Wash. App. 1068, 1999 WL 350657 at 1 (Wash. App. Div. 1) (per curiam),[7] for example, a case Margaret discusses at length, Doran was convicted of telephone harassment and violating a protection order that was in place against him. *Id.* As a condition of his sentence, the trial court ordered him to leave the county upon his release from prison. *Id.* The court of appeals determined that the record did not demonstrate that Doran's conduct, i.e., telephone harassment, and the victim's activities within the county, justified a countywide ban. *Id.* at 3. However, the court refused to rule out the possibility that in some circumstances a countywide prohibition would be appropriate, noting that relying on the well-defined boundaries of a county or city would foster the uniform enforcement of such a restriction. *Id.*

¶ 13. In *Johnson v. State*, 672 S.W.2d 621, 623 (Tex. Ct. App. 1984), the court concluded that banishing Johnson from his county of residence as a condition

---

[7] We note that in this opinion we do cite to two unpublished opinions from other states. WISCONSIN STAT. § 809.23(3) does not prohibit us from doing so. In *Brandt v. LIRC*, 160 Wis. 2d 353, 466 N.W.2d 673 (Ct. App. 1991), *aff'd*, 166 Wis. 2d 623, 480 N.W.2d 494 (1992), we held that the rule does not proscribe citation to circuit court decisions, noting "the statutory scenario of chapter 809 concerns appellate procedure generally and . . . Rule 809.23(3), *read in context*, concerns only court of appeals decisions." *Brandt*, 160 Wis.2d at 363.

of his probation was not reasonably related to his rehabilitation when banishment would leave him broke and unemployed. In a similar vein, in *Jones v. State*, 727 P.2d 6, 8–9 (Alaska Ct. App. 1986), the court vacated a probation condition prohibiting Jones from being within a forty-five block area as not being reasonably related to his rehabilitation. The court determined that the trial court had not given a reason why, in light of the fact that the forty-five block area included both Johnson's work location and residence, it had imposed such a harsh condition. *Id.* at 9. In *McCreary v. State*, 582 So. 2d 425, 426, 428 (Miss. 1991), the court struck down a condition essentially banishing McCreary, who was convicted of rape, from the State of Mississippi, concluding that on the facts available, the condition was also wholly unrelated to McCreary's rehabilitation. The court acknowledged that in another case it had upheld a condition prohibiting an individual from coming within 125 miles of a county, see *Cobb v. State*, 437 So. 2d 1218 (Miss. 1983), but stated that it was concerned about the public policy implications of dumping convicts on another state. *McCreary*, 582 So. 2d at 427–28. Further, in *In re White*, 97 Cal. App. 3d 141, 147 (Cal. Ct. App. 1979), the court struck down a probation condition banishing White, who was convicted of soliciting an act of prostitution, from certain high-prostitution areas during all hours of the day and night. The court could not see how the sweeping prohibition was reasonably related to White's past or future criminality when White's criminal conduct took place at a time of darkness and the evil to be eliminated by the criminal statute, i.e., streetwalking, was more prevalent in the later hours of the day. *Id.* at 147–48.

¶ 14. We acknowledge that several of the cases contain language suggesting that banishment is impermissible, but conclude that these cases either must be limited to their facts or have been modified by subsequent decisions. For example, the court in *In re Mannino*, 14 Cal. App. 3d 953, 965 (Cal. Ct. App. 1971), concluded that banishment was a prohibited term of probation. There, the court invalidated a condition prohibiting a student, who was convicted of assault for kicking a student and resisting police officers at an anti-war demonstration, from entering the grounds of any school in which he was not enrolled. *Id.* at 956, 957 n.2, 962. We observe that in a subsequent unpublished case, the court limited *Mannino* to its facts and upheld an order imposing a similar banishment condition. *See State v. Fred S.*, 2002 WL 1925124, 1 (Cal. App. 2 Dist.).

¶ 15. While in *Bird v. State*, 190 A.2d 804, 807 (Md. Ct. App. 1963), the court did hold that suspension of a sentence conditioned on banishment was beyond the power of the trial court, the conclusion must be read in context of the drastic nature of the banishment condition in that case. The trial court there had banished Bird to Puerto Rico for ten years. *Id.* at 805. Thus, the banishment condition amounted to more than a minor burden on Bird's rights to travel and association. It was, in fact, the equivalent of deporting Bird to another country. Similarly, in *Silva v. Babak S.*, 22 Cal. Rptr. 2d 893, 895, 898 (Cal. Ct. App. 1993), the court vacated a trial court order requiring Babak S., a juvenile, to live with his parents in Iran for two years, concluding that it constituted a de facto deportation.

¶ 16. Although in *State ex rel. Halverson v. Young*, 154 N.W.2d 699, 702 (Minn. 1967), the Minnesota Supreme Court did declare that courts did not have the power to impose banishment as a condition of proba-

tion, more recently, in *State v. Franklin*, 604 N.W.2d 79, 82 (Minn. 2000), the court seemed to modify the earlier ruling and concluded that as a general rule courts did have the authority to impose geographical limitations. In fact, the court explicitly acknowledged that the probation condition in the case—banishment from the city of Minneapolis—was not presumptively invalid. *Id.* at 84. While the court did strike down that condition, it did so because it determined that the source of Franklin's criminal behavior, criminal trespass, was centered on one individual home, which was located mere blocks from the southern border of Minneapolis and miles from the northern border. *Id.* at 83–84.

¶ 17. Finally, we note that in a case neither party cites, this court upheld a banishment condition. *See State v. Nienhardt*, 196 Wis. 2d 161, 164–65, 537 N.W.2d 123 (Ct. App. 1995). In that case, Nienhardt was convicted of unlawful use of a telephone; however, evidence at a sentencing hearing demonstrated that she had engaged in a persistent pattern of harassing phone calls in addition to those underlying the conviction and that she had been observed both spying on and following the victim. *Id.* As a condition of her probation, the trial court banished Nienhardt from the city of Cedarburg. *Id.* at 166. On appeal, Nienhardt had argued that the condition violated her constitutional rights. *Id.* at 168. While we did not specifically address each of Nienhardt's constitutional claims, we did conclude that based on the particular circumstances of the case and the trial court's findings that Nienhardt did not live in Cedarburg and only traveled there to purchase cigarettes, the condition banishing Nienhardt from Cedarburg was not overbroad or unduly restrictive of her right to travel. *Id.* at 168–70.

¶ 18. Thus, banishment is not a per se constitutional violation. As the previous discussion demonstrates, there is no exact formula for determining whether a geographic restriction is narrowly tailored. Each case must be analyzed on its own facts, circumstances and total atmosphere to determine whether the geographic restriction is narrowly drawn.

¶ 19. We therefore turn to the facts of this case. Here, we have an individual who has twice used a vehicle as a dangerous weapon in Walworth county and who has repeatedly demonstrated that a standard, more narrowly tailored, order will not deter her from harassing and endangering the lives of three innocent victims and their families, all of whom live in the county. The evidence in the record demonstrates that while she does not live or work in the county, Margaret frequently rents cars to drive around Walworth county. Further, her statements on the record indicate an absolute fixation on Tina and Pamela and an unwillingness to accept any possibility other than that she has been wronged and has a right to follow, threaten, harass and endanger these two women and their families. In fact, the trial court found that if Margaret were even in Walworth county, she would be tempted to prey upon her victims. Hence, Margaret poses a constant and dangerous threat any time she is present in the county.

¶ 20. Here, we also have three people who, as the record evidences, are victims for no apparent reason and have been driven to desperation by Margaret's continuous harassment. These innocent victims deserve to be able to live their lives free from the constant fear of being tormented and attacked. The geographic

restriction the trial court imposed will provide them with a margin of territorial safety in which they can live in peace.

■

¶ 21. Margaret asserts that there is no basis in the record for concluding that a "keep away" zone of 300 yards would be any less effective than total banishment from the county in ending the harassment. Margaret's use of a car as a tool for tormenting Tina, Pamela and George makes her too mobile and too dangerous for such a limited restriction. An area smaller than the county would provide her with too many opportunities to meet up with her victims, who, as we have noted, live and work in that area. Further, in the event that she does violate the orders and enter Walworth county, relying on the county's boundaries will give area law enforcement the opportunity to apprehend her before she is able to threaten or, worse, seriously injure Tina, Pamela, George and other members of their families. Thus, the injunction and purge condition are properly tailored to prohibit any future harassment and do not unduly impinge on Margaret's constitutionally protected activities. Accordingly, we affirm the orders of the trial court banishing Margaret from Walworth county.

*By the Court.*—Orders affirmed.

¶ 22. ANDERSON, J. (*concurring*). At first blush, a court order banishing Margaret O'Connor from Walworth county and preventing her from visiting her mother appears to be overbroad and an infringement on her constitutional right to travel. I join in the majority opinion but write separately to make clear that both

Margaret's dangerous behavior and the need to protect victims' constitutional rights provide grounds for the order of banishment.

¶ 23. In considering the banishment order in the injunction granted Tina, the guiding principle is that a harassment injunction must be narrowly tailored to prohibit only the proven acts of harassment and to avoid improperly impinging upon constitutionally protected behavior. *See Bachowski v. Salamone*, 139 Wis. 2d 397, 414, 407 N.W.2d 533 (1987). And, the banishment order as a purge condition in the civil contempt involving the Predicks must meet the same standards. *See State ex rel. V.J.H. v. C.A.B.*, 163 Wis. 2d 833, 845, 472 N.W.2d 839 (Ct. App. 1991) (purge conditions must be "feasible *and* must be reasonably related to the cause or nature of the contempt").

¶ 24. There is no doubt that the banishment order is meant to control conduct that Margaret has engaged in. The record includes evidence that at least on two occasions Margaret used an automobile to harass and physically assault the victims. At the hearings, the Predicks and Tina established that Margaret used an automobile to endanger Tina, her daughter and the Predicks' daughter. Margaret attempted to drive Tina off the road and succeeded in forcing Tina into the oncoming lane of traffic. Majority at ¶ 7. Pamela also testified that on an earlier occasion, Margaret had driven a car at her at a high rate of speed, forcing Pamela to jump off the side of the road. Majority at ¶ 3.

¶ 25. The use of an automobile as a weapon to harass and possibly injure others is dangerous behavior that must be prevented. And, when such behavior is part of ongoing stalking, it becomes even more ominous. Stalking is a gender-neutral crime, Jennifer A. Hueter, Note & Comment, *Lifesaving Legislation: But*

*Will The Washington Stalking Law Survive Constitu-tional Scrutiny?,* 72 WASH. L. REV. 213, 215 (Jan. 1997); and, as in this case, the stalker can be a woman known to the victims,[1] Carol E. Jordan et al., *Stalking: Cul-tural, Clinical and Legal Considerations,* 38 BRANDEIS L.J. 513, 533 (Spring, 2000).

¶ 26. Stalking is not a benign behavior, "[s]talking is typically an escalating behavior. Without proper

[1] At least four distinct categories of stalkers have been recognized. A stalker who suffers from delusional erotomania truly believes that the victim, who may not even know of the stalker's existence, is in love with him. This type of stalker usually attempts to establish an intimate relationship with his victim through verbal, written, or physical contact, and believes that his victim recipro-cates his desire for a relationship despite the absence of any actual reciprocity. Unlike a delusional erotomaniac, a stalker suffering from borderline erotomania knows that his victim does not recip-rocate his feelings. However, this type of stalker may express intense fury when his victim does not develop reciprocal feelings. Borderline erotomaniacs usually have had some emotional in-volvement with the victim, although even an innocent glance may trigger the stalker. Borderline erotomaniacs often exhibit the same stalking behavior as delusional erotomaniacs: continually writ-ing letters, making telephone calls, sending gifts, and following their victims. The third type of stalker is the "former intimate" stalker. Unlike the delusional or borderline erotomaniac, the former intimate stalker has had an intimate relationship with his victim. A former intimate stalker typically has a history of abusive relationships; many cases involving this type of stalker result in assault or death. A former intimate stalker is profoundly emotion-ally dependent on his former partner and exhibits a strong need to control her; he "is unable to tolerate the panic and 'abandonment anxiety' that result when his partner leaves the relationship." Finally, the sociopathic stalker differs from the other three types in two distinct ways: he does not try to establish an intimate relationship with his victim and he looks for specific, pre-defined criteria in a victim.

Jennifer L. Bradfield, Note, *Anti-Stalking Laws: Do They Adequately Protect Stalking Victims?,* 21 HARV. WOMEN'S L.J. 229, 236 n.26 (Spring, 1998) (citations omitted).

intervention, a stalker's behavior becomes increasingly disturbing over time and [she] becomes more dangerous to [her] victim. Physical attacks usually follow months of harassing, following, or threatening, and repeated violations of civil protection orders." Jennifer L. Bradfield, Note, *Anti-Stalking Laws: Do They Adequately Protect Stalking Victims?*, 21 HARV. WOMEN'S L.J. 229, 235–36 (Spring, 1998) (footnote omitted). Almost one-half of all victims report that their stalkers directly threaten them. Patricia Tjadean & Nancy Thoennes, *Stalking In America: Findings From the National Violence Against Women Survey,* NATIONAL INSTITUTE OF JUSTICE AND CENTERS FOR DISEASE CONTROL AND PREVENTION, Research in Brief at 7–8, exhibit 12 (April 1998), *at* http:// www.ncjrs.org/pdffiles/169592.pdf. The NIJCDC study found that there is a strong link between stalking and other forms of violence in intimate relationships. *Id.* at 2.

¶ 27. Victims do not just suffer physical injuries from stalking. "Stalking victims suffer profound, long-term emotional injuries at the hands of their stalkers. Many stalking victims experience depression, generalized anxiety, obsessive-compulsive behaviors, and even symptoms of Post-Taumatic Stress Disorder. A number of victims lose time from work, while some never return to work." Bradfield, *supra* ¶ 26, at 232 (footnote omitted). Some victims also report that the stalking caused their personalities to change and they experienced feeling paranoid, being easily frightened, more aggressive and less trusting. Jordan, *supra* ¶ 25, at 534.

¶ 28. There can be no doubt that Margaret's use of an automobile in an attempt to run Pamela, her daughter and Tina off the road is an escalating act of violence that the court is required to directly address and fashion effective protection for the victims. The

court, obviously frustrated by Margaret's repeated violations of the injunction issued to prevent the harassment of the Predicks,[2] chose to create a zone of safety for the victims by banishing Margaret from the county.

¶ 29. It is this geographical banishment that Margaret challenges. She is correct that

> [t]he freedom to move about is a basic right of citizens under our form of government, in fact, under any system of ordered liberty worth the name. It was not added to our United States Constitution by the enactment of the first ten amendments. It is inherent, not only in the Bill of Rights, but in the original document itself. It has properly been termed "engrained in our history" and "a part of our heritage."

*Ervin v. State*, 41 Wis. 2d 194, 200–01, 163 N.W.2d 207 (1968). Although, Margaret does not mention it, Wisconsin also recognizes a constitutional right of intrastate travel:

> [T]ransitory movement within a community is a constitutionally guaranteed right—the right of freedom of movement. The inherent right of freedom of movement involves the freedom to move about on the sidewalks and streets of a community. This right to freely move about one's community is separate and distinct from the right to interstate travel.

*Brandmiller v. Arreola*, 189 Wis. 2d 215, 225, 525 N.W.2d 353 (Ct. App. 1994) (citation omitted), *aff'd*, 199 Wis. 2d 528, 544 N.W.2d 894 (1996).

---

[2] The existence of an injunction does not guarantee protection for the victim; close to seventy percent of all protective orders are violated by the stalker. Patricia Tjadean & Nancy Thoennes, *Stalking In America: Findings From the National Violence Against Women Survey*, NATIONAL INSTITUTE OF JUSTICE AND CENTERS FOR DISEASE CONTROL AND PREVENTION, Research in Brief at 12, exhibit 20 (April 1998), *at* http://www.ncjrs.org/pdffiles/169592.pdf.

¶ 30. Margaret fails to acknowledge that the victims also have a constitutional right to travel and that right includes the right to move freely about the sidewalks and streets of the community. *See id.* When private citizens have competing constitutional rights, it is the duty of the court to achieve a balance between the exercise of those rights, vis-à-vis each individual asserting the constitutional right and the citizenry as a whole. Here, the court had to balance Margaret's right to travel throughout Walworth county against the rights of the victims to move freely and safely throughout Walworth county. In achieving that balance, the court properly considered that on two occasions Margaret had misused the constitutional right to travel by attempting to run the victims off the road. The court also properly considered the safety of all who travel in Walworth county. Because Margaret had endangered others while exercising her right to travel, the court appropriately concluded that to ensure the victims and the citizenry as a whole could freely and safely travel within Walworth county, Margaret had to be banished from the county.

¶ 31. Margaret also fails to acknowledge that another of the victims' constitutional rights is implicated—the right to privacy. This right was discussed as early as 1928 by Justice Brandeis, who referred to it as "the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting).

¶ 32. How the right to privacy interplays with the right to travel was explained by the Washington Supreme Court in *State v. Lee*, 957 P.2d 741 (Wash. 1998). That case involved a challenge that the State's stalking law was overbroad because it potentially infringed on

the right to walk or wander in the community. *Id.* at 751. While the Washington Supreme Court's opinion related to the constitutionality of a statute, its analysis can easily be adopted when considering Margaret's overbreath challenge to the terms of the harassment injunction and to the terms of the purge condition. The Washington Supreme Court acknowledged that the right to travel is a basic right under the United States Constitution and a state law's primary objective cannot be to impede the right to travel. *Id.* The court then observed, "There is an acknowledged constitutional right to be free from governmental interference, but the United States Constitution does not create a right for any person to interfere with the rights of other persons." *Id.* at 751–52.

¶ 33. The Washington Supreme Court then turned to the right to privacy:

> The United States Supreme Court has recognized the "right of privacy" may be created by specific constitutional guaranties although the "right of privacy" does not exist in any specific provision of the United States Constitution . . . . Personal rights found in the guaranty of privacy are fundamental to or implicit in the concept of ordered liberty. If the right of privacy offers any protection, that protection must include the right to be left alone.

> In the case of stalking, as evidenced by these cases, the State has a legitimate interest in restraining harmful conduct. It may do so under the police powers. Individuals have a constitutional right to move about as long as they are not committing a crime. The stalking statute . . . does not interfere with one's legitimate freedom of movement or right to travel, but applies to conduct between two or more persons when one wishes to be left alone and to be free of interference by the other. The statute is a reasonable exercise of the police powers in protecting privacy interests of a segment of

society from invasive oppressive behavior and harmful conduct. One person's freedom of movement gives way to another person's freedom not to be disturbed.

*Id.* at 752–53 (footnotes omitted).

¶ 34. Likewise, in this case, the harassment injunction and purge condition are meant to control Margaret's conduct toward the victims who wish to be left alone and to be free to travel openly and safely on the streets of Walworth county. Because Margaret has proven that she is an imminent danger to the victims, when she is in Walworth county her right to travel must give way to the victims' freedoms to travel and to be left alone. The only alternative available to the court was to create a zone of safety by banishing Margaret from Walworth county.