[No. 58449-9-I.  Division One.  January 7, 2008.]

THE STATE OF WASHINGTON, *Respondent*, v. EDISON ALPHONSE, *Appellant*.

418

*Susan F. Wilk* (of *Washington Appellate Project*), for appellant.

*Janice E. Ellis, Prosecuting Attorney,* and *Thomas M. Curtis, Deputy,* for respondent.

¶1 AGID, J. — Edison Alphonse appeals his convictions for felony and misdemeanor telephone harassment. He challenges the sufficiency of the evidence, asserting that RCW 9.61.230 must be construed to require proof that he had the intent to harass, intimidate, torment, or embarrass when he initiated the call. He also contends that the terms "to embarrass," "lewd," "lascivious," "indecent," and "obscene" render the statute unconstitutionally overbroad on its face and vague as applied to his conduct, and that as applied, the statute violated his First Amendment right to lawfully petition a government official for redress of grievances. Finally, he challenges the trial court's order banishing him from the city of Everett as a condition of his sentence. Because an ordinary reading of RCW 9.61.230 requires only that the State prove the caller formed the requisite intent at some point during the call and, as we have previously held, the statute is neither overbroad nor vague, we affirm. But the banishment order was not narrowly tailored to serve its stated purpose, so we must vacate it.

## FACTS

¶2 In March of 2004, Everett police officer Matt Meyers investigated a complaint made by Nina Reeves, who reported that Alphonse had been sending her harassing e-mails. Reeves was a married woman, who had had a previous relationship with Alphonse and eventually became pregnant. After the relationship ended and Reeves reconciled with her husband, Alphonse contacted Reeves and asserted that he wanted to have a relationship with the child. Reeves told him she did not want him involved with the child, claimed that he was harassing her, and eventually contacted the Everett police.

¶3 Meyers called Alphonse's home in Olympia and spoke with a woman who answered the telephone. He told her that threats had been made from her computer, that Alphonse had been involved with Reeves, and that Alphonse threatened Reeves and her husband, and asked her to tell Alphonse to call him. Alphonse called Meyers

back, told Meyers he was unaware of the investigation, and sent a written statement to Meyers, in which he denied threatening Reeves, suggested that her allegations were retaliatory, criticized the police department's handling of the investigation, and stated that he intended to sue. No charges were filed against Alphonse based on Reeve's complaint, and the case was closed. But Reeves did obtain a protection order against Alphonse, with which he complied.

¶4 In November 2005, six months after closing the investigation, Meyers received an e-mail from Alphonse complaining about the investigation and threatening to sue the police department. In December 2005, he left an angry voice mail on Meyers' office phone in which, among other things, he told Meyers: "There was never any Matt Meyers. He never existed" and "You're dead anyway. You're dead any motherfucking way!" He also stated, "I will blow away 40 hundred cops over my kids dog. 40 hundred, let alone one, let alone one by the name of Matt Meyer." On January 11, 2006, Alphonse left two more voice mails in which he described sexual acts he wished to perform with Meyers' wife.[1] He also stated, "your daughters are in trouble . . . . Your daughters [and] your wife—all of them, all of them are in motherfucking trouble."

¶5 The State charged Alphonse with one count of felony telephone harassment and one count of misdemeanor telephone harassment. A jury found him guilty of both charges. The trial court sentenced him to a term of four months, ordered that he have no contact with Meyers and his family, and ordered that he "not appear in the city limits of the City of Everett" unless required for "legal or judicial reasons."

---

[1] Ex. 2, at 1 (transcript of voice mail recording, attached as Appendix B) ("[M]y dick is gonna stay long and I am gonna continuously keep dicking your motherfucking girl."); App. B at 2 ("And maybe one of these days when you're at work in that motherfucking cubicle sweating bricks, I might be pounding down that pussy . . . . Maybe one of these nights when I feel like getting some pussy, I might give [your wife] a call."); App. B at 3 ("I am gonna forever remain beating your motherfucking bitches down. Every time, open wide, open wide, open wide nigger because this big long ass long fucking dick is coming in, beating that motherfucking pussy down.").

## I. *Proof of the Caller's Intent under RCW 9.61.230*

¶6 Alphonse argues that Washington's telephone harassment statute, RCW 9.61.230, must be construed to require the State to prove that the caller had the intent to harass, intimidate, torment, or embarrass at the time he placed the call, not at some point after the call was initiated. He relies on *State v. Lilyblad*,[2] in which Division Two held that the statute was ambiguous on this element and must be construed to require the State to prove that the caller initiated the call with the requisite intent. The *Lilyblad* decision conflicts with our opinion in *City of Redmond v. Burkhart*,[3] which held that the statute is not ambiguous and requires only that the caller form the requisite intent at some point during a telephone conversation. Applying *Lilyblad*, Alphonse contends that there was insufficient evidence that he had the requisite intent when he initiated the call. Alternatively, he argues that the trial court's failure to instruct the jury that the State had to prove this fact requires reversal and remand for a new trial.

¶7 Issues of statutory construction are reviewed de novo.[4] Rules of statutory construction require courts to give effect to the legislature's intent and purpose.[5] In doing so, we must first look to the plain meaning of the statute.[6] If the statute does not define a term, we give it its ordinary and common law meaning.[7] Only if a statute is ambiguous may we resort to aids of construction, such as legislative

---

[2] 134 Wn. App. 462, 464, 140 P.3d 614 (2006), *review granted,* 160 Wn.2d 1009 (2007).

[3] 99 Wn. App. 21, 27, 991 P.2d 717 (2000).

[4] *State v. Berry*, 129 Wn. App. 59, 69, 117 P.3d 1162 (2005), *review denied,* 158 Wn.2d 1006 (2006).

[5] *State v. Cromwell*, 157 Wn.2d 529, 534, 140 P.3d 593 (2006).

[6] *Id.*

[7] *Burkhart*, 99 Wn. App. at 24.

history.[8] If a statute is ambiguous, we apply the rule of lenity and interpret the statute in favor of the defendant.[9]

¶8 The telephone harassment statute, RCW 9.61.230, provides in pertinent part:

> (1) Every person who, with intent to harass, intimidate, torment or embarrass any other person, shall make a telephone call to such other person:
>
>   (a) Using any lewd, lascivious, profane, indecent, or obscene words or language, or suggesting the commission of any lewd or lascivious act; or
>
>   . . . .
>
>   (c) Threatening to inflict injury on the person or property of the person called or any member of his or her family or household;
>
> is guilty of a gross misdemeanor, except as provided in subsection (2) of this section.

Subsection (2)(b) provides that one is guilty of a felony if "[t]hat person harasses another person under subsection (1)(c) . . . by threatening to kill the person threatened or any other person."

¶9 In *Burkhart*, we rejected the argument that the statute's language "make a telephone call" describes only the initiation of the call. Based on a plain reading of the statute, we concluded that "the threat describes the call," explaining:

> The statute provides that no person with the intent to intimidate "shall make a telephone call . . . *threatening* to inflict injury." RCW 9.61.230 (emphasis added). The statute thus specifically proscribes the type of call prohibited, which cannot be determined until after the call has been initiated. Because a threat must necessarily occur in conversation, it is reasonable to conclude that the Legislature intended "making a call" to encompass a broader meaning than the mere initiation of the

---

[8] *State v. Fisher*, 139 Wn. App. 578, 583, 161 P.3d 1054 (2007).

[9] *State v. Roberts*, 117 Wn.2d 576, 585, 817 P.2d 855 (1991).

call. Thus, it follows that the term "make" as it is used in RCW 9.61.230 is a continuing, rather than a discreet [sic], process.[10] We further concluded that to interpret the statute to apply only to those calls that are dialed while the caller has the requisite intent "defies common sense," "artificially narrows the scope of the statute," and "draws an illogical distinction" between threats made by a caller who initiates the call with the requisite intent and those made by a caller who formulates the intent midconversation.[11]

¶10 In *Lilyblad*, the court held that the same statutory language was ambiguous because it was subject to more than one reasonable interpretation, citing the following point of order during the Senate debate on whether to include unwanted telephone solicitation under this statute:

"The original purpose of Senate Bill No. 77 was to cover those telephone calls which were mala in se, so to speak, and actually where the intent was one of a criminal act, where they intend to actually endanger the recipient of the phone call by obscene language or by harassment or by doing things in which the premeditation is there. The intent which the person has before he picks up the phone is a criminal intent to actually endanger the recipient in some manner. Now that was the original scope and object of Senate Bill No. 77."[12]

The court then applied the rule of lenity and held that the statute must be interpreted to require the State to prove that the defendant had the requisite intent when she initiated the call. The court concluded that there was sufficient evidence that the defendant initiated the call with the requisite intent but reversed because the trial court

---

[10] 99 Wn. App. at 25 (alteration in original).

[11] *Id.* We also referred to the dictionary definitions of "make," which "imply that something is continually being 'made' until the last step necessary for finality is taken and completed." *Id.* at 26.

[12] 134 Wn. App. at 468 (quoting Senate Journal, 40th Leg., Reg. Sess., at 195 (Wash. 1967) (comments of Senator Martin James Durkan)). The court also noted that other than this, there was no other legislative intent to assist it in its interpretation of the statute. *Id.*

failed to instruct the jury that the State had to prove this fact.[13]

¶11 The State asserts that *Lilyblad* incorrectly held that the statute is ambiguous because the statute's intent is to protect persons in their homes from being harassed over the telephone, and a caller violates this privacy regardless of whether the caller had the criminal intent when the call was dialed or developed it at some later point during the call. The State's position is supported by decisions of this court recognizing that the governmental interest behind the statute is " 'protecting its residents from fear and abuse at the hands of persons who employ the telephone to torment others . . . and . . . from the intrusion of unwanted telephone calls'."[14] We have also observed that "[t]he gravamen of the offense is the thrusting of an offensive and unwanted communication upon one who is unable to ignore it."[15] This is because "the telephone provides a caller substantial access into the private space of the person called," and the State penalizes those who exploit that access in order to protect its citizens' privacy.[16]

¶12 Thus, the criminal intent in the statute relates to "the call" or the "communication" as a whole, not just the initiation of the call. As we observed in *Burkhart*, the term "make a call" does not suggest any ambiguity but is consistent with the statute's purpose in criminalizing harassing calls and encompasses the act of calling from its inception until the call is completed.[17] By contrast, the interpretation endorsed by *Lilyblad* results in a "forced,

---

[13] *Id.* at 469.

[14] *State v. Alexander*, 76 Wn. App. 830, 837, 888 P.2d 175 (alterations in original) (quoting *City of Everett v. Moore*, 37 Wn. App. 862, 865, 683 P.2d 617 (1984)), *review denied*, 127 Wn.2d 1001 (1995).

[15] *Id.*

[16] *Id.* at 838.

[17] 99 Wn. App. at 26.

narrow, or overstrict construction which defeats the intent of the legislature."[18]

¶13 The State further argues that the *Lilyblad* court erroneously relied on a point of order to determine that the statute was ambiguous. We have refused to rely on a statement of intent in a legislative preamble to a statute "to override the unambiguous elements section of a penal statute or to add an element not found there."[19] Thus, relying on a single point of order expressing the view of one senator to override the unambiguous elements of RCW 9.61.230 is equally unjustified. Additionally, as the State notes, the legislature has not amended the statute in the seven years since the *Burkhart* decision, evidencing a legislative intent to criminalize harassing calls in which the caller forms the requisite intent at any time during the phone call.[20] And as a practical matter, proving intent before the call would be virtually impossible because there is no overt act until the call is made. We decline to follow the *Lilyblad* decision.

¶14 Alphonse's sufficiency claim therefore fails. There was ample evidence that he had the requisite intent at many times during the telephone call. Similarly, we reject his argument that *Lilyblad* requires the trial court to instruct the jury that he had the requisite intent when he initiated the call. We also note that Alphonse requested the "to convict" instruction, of which he now complains, and is therefore barred from challenging it on appeal.[21]

---

[18] *State v. Cann*, 92 Wn.2d 193, 197-98, 595 P.2d 912 (1979).

[19] *State v. Alvarez*, 74 Wn. App. 250, 258, 872 P.2d 1123 (1994), *aff'd*, 128 Wn.2d 1, 904 P.2d 754 (1995).

[20] *See State v. Fenter*, 89 Wn.2d 57, 62, 569 P.2d 67 (1977) (legislature is presumed to know of the Supreme Court's decisions and consider them in later legislation).

[21] While Alphonse contends that the invited error doctrine does not apply here, case law holds to the contrary. *See State v. Boyer*, 91 Wn.2d 342, 345, 588 P.2d 1151 (1979) (refusing to consider challenge to jury instruction that raised constitutional issue because defendant requested instruction at trial); *Berry*, 129 Wn. App. at 71 (refusing to consider challenge to "to convict" instruction because defendant requested instruction). The cases to which Alphonse cites all involved plea agree-

## II. *Facial Overbreadth: Intent To Embarrass*

¶15 Alphonse next contends that the court's "to convict" instruction was erroneous because it permitted the jury to convict him if the jury found that he made the calls with intent to "embarrass." He argues that because similar language was found unconstitutionally overbroad in *City of Seattle v. Huff*,[22] the court cannot instruct the jury to convict on this basis. But as the State correctly points out, *Huff* did not hold that the language intent to "embarrass" in a telephone harassment ordinance was overbroad; rather the court chose to concur with the city's concession that "embarrass" should be stricken from the ordinance and in fact expressed doubts that this was constitutionally mandated.[23] And, as the State also points out, we have since reevaluated the constitutional sweep of the term "embarrass" as used in RCW 9.61.230 and held that the term does not render the statute unconstitutionally overbroad.[24]

## III. *Lawful Petition To Redress Grievances*

¶16 Alphonse argues that prosecuting him for making calls that were a lawful petition to a government official for redress of grievances violated the First Amendment. He contends that the "vague allusions and sexual references" that may have affronted Meyers were not the sole or primary purpose of making the calls. Rather, he argues, he was seeking to lawfully redress his grievances and cannot be prosecuted for doing so. Alternatively, he argues that the trial court was required to instruct the jury that it had to find that the calls were made solely to harass and the failure to do so requires reversal.

¶17 The First Amendment provides aggrieved citizens the right to petition the government for redress and

---

ments that contained errors of which the defendant had no knowledge and to which he did not specifically agree, which is not the case here.

[22] 111 Wn.2d 923, 767 P.2d 572 (1989).

[23] *Id.* at 928.

[24] *Alexander*, 76 Wn. App. at 836.

protects a significant amount of verbal criticism and challenge directed at police officers.[25] In reviewing a claim that a statute as applied infringes on First Amendment rights, we conduct an independent review of the record to decide if the speech is unprotected.[26]

¶18 Alphonse asserts that the calls made to Meyers in his official capacity as a police officer and the messages left on his police department voice mail were primarily complaints about Meyers' investigation of Reeves' harassment allegations. He cites parts of the message in which the caller criticized Meyer for informing his wife that he impregnated another woman, voiced frustration that Meyers did not inform him that the investigation was concluded, expressed his belief that the investigation was racially motivated, and claimed that the unfounded investigation prevented him from seeing his son born. Alphonse contends that the fact that these grievances may have been "interspersed" with offensive language does not take them out of the realm of protected speech.

¶19 In support of this contention, he cites to a footnote in *State v. Dyson*[27] suggesting that applying RCW 9.61.230 to a citizen's calls to a public official might be unconstitutional. But as we held in *Dyson*, the statute "regulates conduct implicating speech, not speech itself" by requiring an intent to harass, intimidate, torment or embarrass when the speech is uttered.[28] Indeed, the footnote upon which Alphonse relies states, "such telephone calls [including those to a public official] would not fall within the

[25] U.S. CONST. amend. I (providing that Congress "shall make no law . . . abridging . . . the right . . . to petition the government for a redress of grievances"); *City of Houston v. Hill*, 482 U.S. 451, 461, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (ordinance prohibiting speech that "in any manner . . . interrupt[s] any policeman" overbroad for failing to limit speech to language that is not constitutionally protected), *appeal dismissed, cert. denied*, 483 U.S. 1001 (1987).

[26] *State v. Kilburn*, 151 Wn.2d 36, 43-44, 50-52, 84 P.3d 1215 (2004).

[27] 74 Wn. App. 237, 245 n.5, 872 P.2d 1115, *review denied*, 125 Wn.2d 1005 (1994).

[28] *Id.* at 243 (citing *State v. Talley*, 122 Wn.2d 192, 210, 858 P.2d 217 (1993)).

purview of the subsection *unless the caller had the requisite intent.*"[29]

¶20 Applying the statute here did not violate Alphonse's First Amendment rights. While Alphonse may have been legally voicing disapproval about the way in which Meyers handled the investigation, once he used speech to harass, intimidate, torment, or embarrass Meyers, his conduct became criminal. By threatening to harm and kill Meyers, and by using obscene language and vulgar descriptions of sexual acts he threatened to perform on Meyer's wife to demean and humiliate him, he demonstrated a criminal intent to harass, intimidate, torment, and embarrass. Thus, prosecuting him for making such calls did not violate his First Amendment right to petition the government to redress grievances.[30]

¶21 Alternatively, Alphonse argues that we should reverse and remand with instructions that the jury must find that the calls were made solely to harass and that he had a constitutional right to petition the government to redress grievances.[31] He argues that by not being so instructed, the jury may have improperly considered constitutionally-protected speech in reaching its verdict. He asserts that failure to provide this instruction was not harmless error because "none of the alleged criminal acts can fairly be extrapolated from the constitutionally-protected context of a citizen complaint to redress a grievance." He notes that the alleged threat to kill was made "in the same breath as" the criticism of Meyer as an incompetent

---

[29] *Id.* at 245 n.5 (emphasis added).

[30] *See In re Pers. Restraint of Parmelee*, 115 Wn. App. 273, 287, 63 P.3d 800 (2003) (rejecting claim that vulgar language used in prison grievance was protected First Amendment speech because defendant was punished not for using grievance process, but for "degrading, abusive language he chose to use in the exercise of his right"), *review denied*, 151 Wn.2d 1017 (2004).

[31] Alphonse did not raise this argument in the trial court. We address it here only because it implicates First Amendment rights.

investigator and the Everett Police Department as corrupt.[32]

¶22 But the "to convict" instructions here specifically required a finding of criminal intent, including an intent to harass and a true threat to kill. An additional instruction defined "true threat" to exclude those "said in jest, idle talk, or political argument."[33] And our review of the record shows that a reasonable juror could easily separate the discernable threats made here from any legitimate complaints. A further limiting instruction was not required.

IV.   *Overbreadth: Lewd, Lascivious, Indecent, and Obscene Speech*

¶23 Alphonse argues that the misdemeanor portion of RCW 9.61.230 is unconstitutionally overbroad because the terms "lewd, lascivious, indecent, and obscene" are not statutorily defined and other definitions result in criminalizing protected speech. A statute is void as overbroad if its prohibitions extend beyond protected free speech activities and no means exist by which to sever its unconstitutional applications.[34] In *Dyson*, we rejected a similar overbreadth challenge to the inclusion of these terms in RCW 9.61.230(1). We first noted that the statute regulates conduct implicating speech, not speech itself, and that the speech component is clearly directed against spe-

---

[32] Alphonse asserts in his reply that, unlike in *Parmelee*, here no threat was identified that distinguished it from the otherwise valid grievance and a limiting instruction was therefore required. But in *Parmelee*, the court simply concluded that the offensive language was not necessary to exercise the right to make a grievance and was therefore sanctionable. 115 Wn. App. at 287. And as discussed above, the threats made here were not necessary to convey Alphonse's grievances.

[33] *See also Kilburn*, 151 Wn.2d at 43 (holding that interpreting felony harassment statute to prohibit only true threats avoids overbreadth concerns).

[34] *Huff*, 111 Wn.2d at 925 (citing *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S. Ct. 736, 84 L. Ed. 1093 (1940); *City of Seattle v. Eze*, 111 Wn.2d 22, 31, 759 P.2d 366 (1988)).

cific conduct.[35] We also concluded that because the statute contains a criminal intent element and "the level of constitutional protection given to 'lewd, lascivious, profane, indecent, or obscene words or language' is minimal at best," the impact on protected speech is insubstantial.[36]

¶24 Alphonse argues these terms are too subjective, and a person could be convicted for making a legitimate complaint to the government if a jury finds that he used lewd, lascivious, indecent, or obscene language because such a complaint may be considered "tormenting" or "harassing." *Dyson* rejected a similar argument that the statute prohibited legitimate complaints when "swear words" were used because the focus of the statute is on the caller's intent, not the listener's subjective perception.[37] Thus, under Alphonse's scenario, the caller would be convicted only if the jury found the caller intended to torment or harass.

¶25 To "complain" is not synonymous with to "torment" or "harass," as Alphonse suggests. One may certainly voice a legitimate complaint without resorting to speech that rises to the level of tormenting or harassing the recipient. As we recognized in *In re Personal Restraint of Parmelee*, one may be "held accountable for the degrading, abusive language [one chooses] to use in the exercise of his right [to voice a grievance]."[38] And here, as discussed above, Alphonse used offensive language precisely to harass, intimidate, and torment Meyers by making threats to Meyers' life and sexually demeaning his wife with vulgar descriptions of lewd acts. In doing so, he demonstrated a criminal intent that clearly went beyond criticizing a public official.

---

[35] 74 Wn. App. at 243 (citing *Talley*, 122 Wn.2d at 210).

[36] *Id.* at 244.

[37] *Id.* at 245 n.5 (citing *People v. Taravella*, 133 Mich. App. 515, 350 N.W.2d 780, 782-84 (1984); *Huff*, 111 Wn.2d at 930).

[38] 115 Wn. App. 273, 287, 63 P.3d 800 (2003), *review denied*, 151 Wn.2d 1017 (2004).

¶26 Contrary to Alphonse's contentions, *United States v. Popa*[39] does not compel a different result. In *Popa*, the federal circuit court held that a federal telephone harassment statute was unconstitutionally overbroad as applied to calls made to a United States Attorney in which the defendant criticized him and called him derogatory names. But neither the statute nor the facts addressed in *Popa* are at issue here. Popa was prosecuted under 47 U.S.C. § 223-(a)(1)(C), which prohibits making a telephone call "without disclosing [one's] identity and with intent to annoy, abuse, threaten, or harass any person at the called number or who receives the communications." He made telephone calls in which he called the United States Attorney " 'a negro' " and " 'a whore, born by a negro,' " and accused him of " 'violating the rights in court of the white people.' "[40] The court concluded that "[i]nsofar as the intents to annoy, to abuse, or to harass were implicated, the statute fails intermediate scrutiny as applied to Popa's conduct."[41]

¶27 The *Popa* court's focus was on the statute's inclusion of speech not at issue here. Washington's statute does not include speech that annoys or abuses, and while it does contain an intent to harass, it also requires that such intent be accompanied by either (1) lewd, lascivious, profane, or obscene words; (2) suggestions of lewd or lascivious acts; or (3) threats of injury.[42] The federal statute has no comparable additional requirement. Here, Alphonse's intent to harass was unquestionably accompanied by lewd and profane language, suggestions of lewd acts, and threats of injury. Thus, unlike the federal statute, the Washington statute sufficiently narrows speech that harasses.

¶28 Alphonse further contends that his suggestion of consensual intercourse with Meyers' wife was "an entirely

---

[39] 337 U.S. App. D.C. 411, 187 F.3d 672 (1999).

[40] *Id.* at 673-74.

[41] *Id.* at 678.

[42] RCW 9.61.230(1)(a), (c).

legal act" and was therefore constitutionally protected speech. But as we held in *Dyson*, this type of speech, which was made over the telephone with the intent to harass, intimidate, torment, or embarrass the officer is afforded minimal constitutional protection.[43] In so holding, we reiterated the long-recognized principle that the First Amendment does not protect certain classes of speech: the lewd and obscene, the libelous, the insulting or "fighting" words—" 'those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.' "[44] Our review of the transcript indicates that Alphonse was not merely *suggesting a legal act* of consensual intercourse but sought to demean Meyers' wife with obscene and lewd language, and thereby humiliate and torment Meyers. These words unquestionably "by their very utterance inflict[ed] injury," and are not within the realm of protected speech. Alphonse fails to show that the statute is overbroad on its face.

¶29 Finally, Alphonse urges us to reconsider *Dyson*, in light of the Supreme Court's later decision in *City of Bellevue v. Lorang*.[45] In *Lorang*, the court held that Bellevue's telephone harassment ordinance was unconstitutionally overbroad because it included "profane" speech, which is speech that is critical of religion and protected by the First Amendment.[46] Because *Lorang* did not address the issue raised in *Dyson* or in this appeal, we see no reason not to adhere to our reasoning in *Dyson*.

---

[43] 74 Wn. App. at 244.

[44] *Id.* (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72, 62 S. Ct. 766, 86 L. Ed. 1031 (1942)); *see also Kilburn*, 151 Wn.2d at 42 (reiterating that such speech is " 'of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality' " (internal quotation marks omitted) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 504, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984))).

[45] 140 Wn.2d 19, 992 P.2d 496 (2000).

[46] *Id.* at 29.

## V. *Vagueness*

¶30 Alphonse argues that the misdemeanor portion of the statute proscribing "lewd, lascivious, indecent or obscene" words is unconstitutionally vague as applied to his conduct because he must guess whether his use of certain words is "indecent," "lewd," or "lascivious." A statute is " 'void for vagueness if it is framed in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application.' "[47] We analyze vagueness claims under the Fourteenth Amendment due process test, which requires the challenger to demonstrate beyond a reasonable doubt that the statute either (1) fails to sufficiently define the offense so that ordinary people can understand what conduct is proscribed or (2) fails to provide ascertainable standards of guilt to protect against arbitrary enforcement.[48]

¶31 Determining whether a statute sufficiently defines an offense "does not demand impossible standards of specificity or absolute agreement."[49] For a statute to be unconstitutional, its terms must be " 'so loose and obscure that they cannot be clearly applied in any context.' "[50] The statute's requirement that the defendant have a specific intent may also defeat a vagueness challenge.[51] Both the United States Supreme Court and the Washington State Supreme Court have held that the word "obscene" is not

---

[47] *Eze*, 111 Wn.2d at 26 (quoting *O'Day v. King County*, 109 Wn.2d 796, 810, 749 P.2d 142 (1988)).

[48] *City of Spokane v. Douglass*, 115 Wn.2d 171, 178, 795 P.2d 693 (1990); *Lorang*, 140 Wn.2d at 30.

[49] 115 Wn.2d at 179 (citing *Kolender v. Lawson*, 461 U.S. 352, 361, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983)).

[50] *Id.* at 182 n.7 (quoting *Basiardanes v. City of Galveston*, 682 F.2d 1203, 1210 (5th Cir. 1982)).

[51] *See City of Seattle v. Webster*, 115 Wn.2d 635, 802 P.2d 1333 (1990), *cert. denied*, 500 U.S. 908 (1991); *State v. Stark*, 66 Wn. App. 423, 434, 832 P.2d 109 (1992) (when statute requires specific criminal intent, "remaining terms are less vague or indefinite than they might otherwise be considered").

unconstitutionally vague.[52] Our courts have also commonly defined the terms "indecent" and "obscene."[53]

¶32 Alphonse argues that because some of the words he used may be deemed by some to be "indecent," "lewd" or "lascivious," but may be commonly used by others, a person must guess whether using these words would constitute criminal conduct. But common use of these words is not equivalent to ignorance of their offensive nature. As discussed above, Alphonse used obscene language here precisely so that he could offend, humiliate, and torment Meyers. The record is also undisputed that he used language "suggesting the commission of any lewd or lascivious act," which is clearly prohibited by the statute.[54] His claim that he was unsure whether using such language fell within the statutory prohibitions is neither logical nor credible. Additionally, the statute includes a specific element which further serves to dispel any vagueness concerns.[55]

¶33 Nor has Alphonse demonstrated that the statute poses a danger of arbitrary or selective enforcement. To do so, he must show that the statute invites an inordinate

---

[52] *Roth v. United States*, 354 U.S. 476, 491, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957); *State v. J-R Distribs., Inc.*, 82 Wn.2d 584, 600-01, 512 P.2d 1049 (1973), *cert. denied*, 418 U.S. 949 (1974).

[53] *See State v. Lansdowne*, 111 Wn. App. 882, 891-92, 46 P.3d 836 (2002) (defining "indecent" as " 'not decent: . . . altogether unbecoming: contrary to what the nature of things for which circumstances would dictate as right or expected or appropriate: hardly suitable: unseemly' "; defining "obscene" as " 'marked by violation of accepted language inhibitions and by the use of words regarded as taboo in polite usage.' ") (alteration in original) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1147, 1557 (1993)).

[54] RCW 9.61.230(1)(a). Alphonse refers to his use of the words "nigger," "cracker," "motherfucker," and "pussy," but neglects to mention the more explicit sexual references he used to describe sex acts he wished to perform with Meyers' wife, which would clearly fall within the statute.

[55] *See Stark*, 66 Wn. App. at 434. The additional cases appellant cited in the reply brief address federal and another state's statutes and are contrary to our decisions in *Dyson* and *Alexander*. *See Alexander v. Johnson*, 217 F. Supp. 2d 780, 800-01 (S.D. Tex. 2001) (invalidating Texas stalking statute that prohibited calls intended to " 'harass, annoy, alarm, abuse, torment, embarrass, or offend' " (quoting TEX. PENAL CODE ANN. § 42.07(a)(4)), *aff'd sub nom. Alexander v. Cockrell*, 294 F.3d 626 (2002); *Popa*, 187 F.3d 672.

amount of police discretion.[56] Alphonse argues that because police and prosecutors could charge a person who seeks to legitimately complain about government conduct with making harassing calls, the statute may be used to chill protected speech. But he fails to demonstrate how protected speech will be subject to an inordinate amount of police discretion when the State may charge only those complaints that are made with criminal intent. Because it includes an intent element, RCW 9.61.230 defines the proscribed conduct in reference to the caller, not the recipient, and thereby contains sufficient guidelines to prevent arbitrary enforcement.[57]

## VI. *Banishment Order*

¶34 Banishment orders encroach on an individual's constitutional right to travel, which includes the right to travel within a state.[58] Because of the constitutional implications, courts apply strict scrutiny in reviewing a banishment order.[59] To survive such review, the order must be narrowly tailored to serve a compelling governmental interest.[60] In making this determination, we consider the following nonexclusive factors: (1) whether the restriction is related to protecting the safety of the victim of or witness to the underlying offense, (2) whether the restriction is punitive and unrelated to rehabilitation, (3) whether the restriction is unduly severe and restrictive because the defendant resides or is employed in the area from which he is banished, (4) whether the defendant may petition the court to temporarily lift the restriction if necessary, and (5)

---

[56] *Douglass*, 115 Wn.2d at 181; *Alexander*, 76 Wn. App. at 841.

[57] *See Alexander*, 76 Wn. App. at 842-43.

[58] *State v. Schimelpfenig*, 128 Wn. App. 224, 226, 115 P.3d 338 (2005) (citing *Shapiro v. Thompson*, 394 U.S. 618, 630-31, 634, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974); *Eggert v. City of Seattle*, 81 Wn.2d 840, 845, 505 P.2d 801 (1973)).

[59] *Id.* (citing *Thompson*, 394 U.S. at 634).

[60] *Id.*

whether less restrictive means are available to satisfy the State's compelling interest.[61]

¶35 In *State v. Schimelpfenig*, the court held that an order banishing a murder convict from Grays Harbor County failed strict scrutiny because the order was not narrowly tailored to serve its stated purpose, which was to prevent the victim's relatives from being reminded of the defendant.[62] The court noted that a more narrowly tailored restriction, such as an order prohibiting contact with the families, could sufficiently protect the victim's family from being reminded of their loss.[63] The court also suggested that other countywide or jurisdictional prohibitions may be appropriate but that "the propriety of such restrictions must turn on the facts of each case."[64]

¶36 Applying the factors here, we hold that the trial court's banishment order does not survive strict scrutiny. The restriction is related to protecting the safety of the victim and other police officers Alphonse included in his harassing phones calls, which has been found to be a compelling State interest.[65] It is not unduly severe and restrictive because Alphonse neither lives nor works in the city of Everett. But less restrictive means were available to serve the State's interest, and the restriction was unrelated to rehabilitation. Finally, other than permitting him to appear for court hearings related to this offense, the order did not allow Alphonse to petition the court to temporarily lift the restriction.

¶37 The most significant of these factors is the availability of less restrictive means to serve the court's stated purpose in issuing the order. Even though the purpose was a compelling State interest, the court did not narrowly

---

[61] *Id.* at 228-29.

[62] 128 Wn. App. 224, 226, 115 P.3d 338 (2005).

[63] *Id.*

[64] *Id.* at 230.

[65] *Id.* at 229.

tailor the order to serve that interest.[66] An order restricting contact with Meyers and his family; requiring Alphonse to stay a specified distance from Meyers, his home, and the police department; and restricting any uninitiated contact with any member of the police force absent emergency circumstances could adequately serve the State's interest in protecting the victim.[67] We also note that cases in which such banishment orders have been upheld involved either brutal assaults of the victim, repeated harassment, or repeated violations of no contact orders, and banishment was the only effective means of protecting the victim.[68] The record here contains no such allegations of brutality, repeated offenses, or previous violations of orders restricting contact.[69]

¶38 We affirm the conviction but vacate the banishment order and remand to the trial court to enter an order consistent with this opinion.

SCHINDLER, A.C.J., and ELLINGTON, J., concur.

Review granted and case remanded to the Court of Appeals at 164 Wn.2d 1021 (2008).

---

[66] See id. (holding that even if interest advanced by banishment order was compelling, order was not narrowly tailored to serve that interest); see also Halsted v. Sallee, 31 Wn. App. 193, 197, 639 P.2d 877 (1982) (restraining order banning mentally unstable father from traveling north of a certain town not sufficiently tailored to serve State interest in protecting children).

[67] Schimelpfenig, 128 Wn. App. at 230; see also Halsted, 31 Wn. App. at 197 (less restrictive order prohibiting communication or contact could have served State interest in protecting children from mentally unstable father).

[68] See, e.g., People v. Brockelman, 933 P.2d 1315 (Colo. 1997) (brutal assault and violation of restraining orders); Predick v. O'Connor, 260 Wis. 2d 323, 336-37, 660 N.W.2d 1 (Ct. App.) (assault, stalking, harassment, and repeated violations of no contact orders), cert. denied, 540 U.S. 1047 (2003); State v. Nienhardt, 196 Wis. 2d 161, 537 N.W.2d 123 (Ct. App.) (repeated stalking and harassment), review denied, 540 N.W.2d 202 (1995).

[69] Arguably, Reeves' complaint alleging that Alphonse harassed her by e-mail demonstrates that this was a repeated offense, but no charges were ever filed as a result of this complaint. Additionally, the record indicates that Alphonse complied with a protective order Reeves obtained against him after the case involving her complaint was closed.