FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

2017 SEP -5 AM 9: 17

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 74204-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SLOAN PATRICK STANLEY, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: September 5, 2017 |
| | ) | |

VERELLEN, C.J. — Following a jury trial, Sloan Stanley was convicted of nine counts of felony cyberstalking. He now appeals, contending that (1) the trial court incorrectly instructed the jury on what constitutes a "true threat," (2) the State presented insufficient evidence that he made true threats to kill as charged in counts six and nine, (3) the cyberstalking statute is unconstitutionally overbroad and vague, in violation of the First Amendment, and (4) the prosecutor committed prejudicial misconduct during closing argument. We affirm the convictions.

## FACTS

In 2009, Sloan Stanley began patronizing the Atlantic Crossing Pub in Seattle's Roosevelt district. Elizabeth Williams worked as a bartender at the pub. Friends Alyson Gray, Miriam Much, and Leah Mesford lived in the neighborhood and frequented the pub.

While at the pub, Stanley would make small talk with Gray, Much, and Mesford, but appeared to focus specifically on Gray, which made Gray uncomfortable. Stanley and Gray's relationship were mere acquaintances, and they did not exchange contact information.

In July 2010, Stanley got into an argument with the kitchen manager at the pub and threatened to slit his throat. Williams kicked Stanley out and told him he was permanently banned from the pub. As Stanley was leaving, he threatened to shoot up the pub.

In December 2010, Stanley found Gray's email address on the internet and began emailing her. Gray had since moved out of the neighborhood and no longer patronized the Atlantic Crossing Pub. The emails were initially friendly, and Gray responded courteously. In his emails, Stanley asked Gray about the night of June 10, 2010. Stanley apparently believed there had been some form of encounter between him, Gray, Much, and Williams that night but he could not remember. Stanley's emails quickly became hostile and aggressive. Gray told him not to contact her anymore, but Stanley continued to send Gray emails for months. The emails were "dark" and they "terrified" Gray.[1]

Gray told Much about the emails and learned Stanley also had been sending similar emails to Much, questioning her about the night of June 10, 2010. Much initially responded to Stanley's emails, telling him she did not know what he was talking about, but she soon began to delete the emails and did not respond. Like the emails to Gray,

---

[1] Report of Proceedings (RP) (July 23, 2015) at 588.

Stanley's emails to Much became increasingly hostile and threatening. Much changed her email address, but Stanley began sending her private messages through Facebook.

Despite being banned from the Atlantic Crossing Pub, Stanley tried to enter the pub on April 18, 2011, and the police were called. A week later, on April 25, 2011, Stanley entered the pub and refused to leave. Williams called the police. By the time an officer arrived, Stanley had left. One of Stanley's ex-roommates was at the pub and gave the officer Stanley's telephone number. The officer called Stanley and told him not to return to the pub and not to contact anyone there. Stanley agreed he would not.

In January 2012, after continuing to receive messages from Stanley, Gray and Much contacted the police. An officer reviewed Stanley's messages and suggested the women close their social media accounts, change their email addresses, and get restraining orders against Stanley. Gray and Much changed their contact information but decided against a restraining order so as not to further agitate Stanley.

In June 2012, Much created a new Facebook account and Stanley immediately began using the name "Erwin Jenkins" to send messages. Much did not respond. Like his previous emails, Stanley's messages were aggressive and threatening: "[I] want to kill you people. [I] want to strangle you with my bare hands until you are no longer breathing you fucking whore."[2] Much was very frightened by the messages, which continued for two more years, until May 2014.

Meanwhile, Stanley also sent messages to Mesford through Facebook. Consistent with the theme of his messages to Gray and Much, Stanley repeatedly asked Mesford what happened that June 2010 night. Stanley's messages were

---

[2] Ex. 10 at 21.

threatening. Just two weeks into messaging Mesford, Stanley told her, "I'm going to cut the little fucking heart out of your dog and shove it down your throat and make you fucking choke on it. I like all the death in this world. [I] want to see more. I want to see society tremble."[3] Stanley sent Mesford hundreds of messages, many describing the horrific ways in which he wanted to kill her.[4] In the messages, Stanley also mentioned he had stopped by Mesford's place of work and had been to her apartment complex. Mesford eventually quit checking the messages, but later discovered many more from Stanley and realized "they had progressed into more threatening" messages.[5] Mesford became concerned she had not "realize[d] the severity of the situation."[6]

Stanley also used the name Erwin Jenkins to send Williams harassing and threatening messages on Facebook. Beginning in January 2013, his messages continued for a year and a half and became increasingly aggressive. When Williams discovered the messages, she felt "fearful and threatened."[7]

After previously cancelling her online accounts in 2012 to avoid Stanley, Gray rejoined Facebook in early 2014. Within a couple of weeks, Stanley started using the name Erwin Jenkins to send her vulgar threatening messages. Gray was "terrified."[8] She blocked him, but he began sending messages to her business accounts.

---

[3] Ex. 8 at 4.

[4] Id. at 6-7 (telling Mesford he would break into her house with a rag of ether, inject her with horse tranquilizer, and bind her so tightly that her limbs would need to be amputated); Ex. 8 at 16 (telling Mesford he would slit her throat).

[5] RP (July 27, 2015) at 736.

[6] Id. at 721.

[7] Id. at 663.

[8] RP (July 23, 2015) at 592.

Between May and August 2014, Stanley sent Gray nearly 50 messages, threatening and harassing her. For example, on June 26, 2014: "[I] want to kill you fucking whores. I can't fight this feeling anymore[. I] will find you and [I] will fucking kill you you fucking worthless fucking whore. . . . I swear to god [I] will fucking kill you."[9] On August 12, 2014, Stanley wrote her, "[I]'ll find you and put a bullet in your fucking head. . . . [I] will fucking kill you you worthless fucking whore. [I] will fucking find you."[10] And on August 17, 2014, Stanley messaged Gray, "I am ready to hunt you down and fucking kill you. [I] swear to fucking god something bad will happen. . . . I'll send you all to hell."[11] In August 2014, Gray called the police again and reported the messages. She obtained a permanent stalking protection order against Stanley.

Detective Rande Christensen spoke to Stanley on the phone in late September 2014. When Detective Christensen told Stanley that Gray, Much, Mesford, and Williams were alleging harassment, Stanley admitted he had been harassing the women for four years and that he used the made-up name Erwin Jenkins. He also admitted he threatened to kill the women. Detective Christensen arranged an in-person interview with Stanley on October 3, 2014. During the recorded interview, Stanley told Detective Christensen that the purpose of his messages was to "break [the women] down" so they would talk to him.[12] He said he threatened the women to "increase their stress" and to "scare" them.[13] When asked how he would feel if someone made similar

---

[9] Ex. 4 at 49-50.

[10] Id. at 58.

[11] Id. at 61.

[12] Pretrial Ex. 4 at 46.

[13] Id. at 74.

threats to him, Stanley admitted he would be concerned and would report the threats to the police. Detective Christensen arrested Stanley.

The State charged Stanley with nine counts of felony cyberstalking (counts 1 through 3 with Gray as the alleged victim; counts 4 through 6 with Much as the alleged victim; counts 7 and 8 with Mesford as the alleged victim; and count 9 with Williams as the alleged victim). Stanley represented himself at trial. A jury convicted him of all nine counts. The court sentenced Stanley to 25 months in custody and 25 months on community custody.

Stanley appeals.

## ANALYSIS

### I. Jury Instruction 9

Stanley argues the trial court incorrectly instructed the jury on what constitutes a "true threat." His argument fails.

"True threats" are an unprotected category of speech under the First Amendment.[14] "A true threat is 'a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted as a serious expression of intention to inflict bodily harm upon or to take the life of another person.'"[15] "The speaker of a 'true threat' need not actually intend to carry it out."[16] Instead, it is enough that a reasonable speaker would foresee that the threat would be considered serious.[17]

---

[14] State v. Kilburn, 151 Wn.2d 36, 42, 84 P.3d 1215 (2004).

[15] State v. Schaler, 169 Wn.2d 274, 283, 236 P.3d 858 (2010) (quoting id. at 43).

[16] Id. (quoting Kilburn, 51 Wn.2d at 46).

[17] Id.

Here, the court properly instructed the jury as to this standard in Instruction 9:

Threat means to communicate, directly or indirectly, the intent to cause bodily injury in the future to the person threatened or to any other person.

*To be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk, or political argument.*[18]

Nevertheless, Stanley argues that the United States Supreme Court's decisions in Virginia v. Black[19] and Elonis v. United States[20] require a subjective test when evaluating "true threats" under the First Amendment. But our Supreme Court in State v. Trey M. expressly rejected this exact argument.[21] Stanley acknowledges this precedent, yet relies on State v. Tyler for the proposition that the Court of Appeals should follow the United States Supreme Court rather than the Washington Supreme Court on issues of federal constitutional law.[22]

Stanley misreads the observation in Tyler that when the most recent pronouncement on an issue of federal constitutional law comes from the United States

---

[18] Clerk's Papers (CP) at 158 (emphasis added).

[19] 538 U.S. 343, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003).

[20] __ U.S. __, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015).

[21] 186 Wn.2d 884, 908, 383 P.3d 474 (2016) ("We reject the invitation of appellant and amicus to abandon this court's settled precedent, which applies an objective (reasonable person) test in determining a true threat for First Amendment purposes. Appellant does not convince us that either the Supreme Court's recent decision in Elonis or its previous decision in Black require such a change.").

[22] 195 Wn. App. 385, 389, 382 P.3d 699 (2016), disagreed with by State v. Johnson, 188 Wn.2d 742, 399 P.3d 507 (2017) (following a United States Supreme Court decision regarding the Fourteenth Amendment right to due process instead of a contrary Washington Supreme Court opinion because "[t]he United States Supreme Court is the paramount authority on the federal constitution").

Supreme Court, this court applies that analysis rather than a contrary Washington Supreme Court opinion that *predates* the United States Supreme Court's.[23] Here, the most recent pronouncement is from our Supreme Court. Because "[i]t is error for the Court of Appeals not to follow directly controlling authority by the Supreme Court," we are bound by the decision in Trey M.[24]

## II. Sufficient Evidence

Stanley contends the State presented insufficient evidence that he made true threats to kill Much and Williams as charged in counts 6 and 9 under the objective reasonable person test. We disagree.

As charged, cyberstalking is defined as threats to kill a person made by electronic communication to such person or a third party with intent to harass, intimidate, torment or embarrass.[25] In reviewing a sufficiency of the evidence claim, we review the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[26] Because the crime of cyberstalking implicates First Amendment rights, we must conduct "'an independent examination of the whole record'" to assure the conviction "'does not constitute a forbidden intrusion on the field of free expression.'"[27]

---

[23] Id. at 392-98.

[24] State v. Pedro, 148 Wn. App. 932, 950, 201 P.3d 398 (2009).

[25] RCW 9.61.26(3)(b).

[26] State v. Witherspoon, 180 Wn.2d 875, 883, 329 P.3d 888 (2014).

[27] Kilburn, 151 Wn.2d at 50 (internal quotation marks omitted) (quoting Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 508, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)).

An independent review of the record is "not complete de novo review."[28] Review is limited to "those 'crucial facts' that necessarily involve the legal determination whether the speech is unprotected."[29] "Crucial facts" are those facts that are "so intermingled with the legal questions as to make it necessary, in order to pass on the constitutional question, to analyze the facts."[30] An independent constitutionally-based review requires us to give due regard "to the trial judge's opportunity to observe the demeanor of the witnesses" and the trial court's determination as to credibility.[31]

"Whether a statement is a true threat or a joke is determined in light of the entire context, and the relevant question is whether a reasonable person in the defendant's place would foresee that in context the listener would interpret the statement as a serious threat or a joke."[32]

With respect to Much, Stanley concedes that two of his messages to her constitute true threats to kill under the objective reasonable person test,[33] but argues insufficient evidence supports a third conviction. He relies on State v. Kohonen.[34]

---

[28] Id. at 50-52.

[29] Id. at 52.

[30] Id. at 51.

[31] Bose, 466 U.S. at 499-500.

[32] Kilburn, 151 Wn.2d at 46.

[33] Appellant's Br. at 45; Ex. 10 at 11 ("Do you know [I] get very strong feelings of wanting to kill you all. . . . I become consumed with a rage that is starting to be uncontrollable. . . . *I am warning you at least one of you will be dead because I am not going out alone.*" (emphasis added); Ex. 10 at 20 (*I'm going to make you fucking pay bitch.* All you fucking whores. *I'm going to send you back to hell where you fucking belong* you fucking worthless fucking whore." (emphasis added)).

[34] 192 Wn. App. 567, 370 P.3d 16 (2016).

In Kohonen, a teenager "tweeted" two messages stating that she "still wanted to punch" a classmate, and that the classmate "must[ ]die."[35] When the classmate later discovered the Twitter posts, the classmate felt angry and embarrassed by them but was not frightened because she did not think Kohonen would actually hurt her. This court looked at the words in the context they were uttered, including the identity of the speaker (a teenager), the audience (a group of Twitter followers, approximately 100 of Kohonen's peers), the medium used to communicate the words (a popular social media platform used for "thoughts," "feelings," and "inside jokes with friends"), the greater environment in which the words were made (high school), and the classmate's lack of fear to conclude there was no true threat.

Here, in contrast, over the course of two years, Stanley, an adult, sent hundreds of private messages to Much's email and Facebook accounts, a person he barely knew, demanding information from her. When Much did not provide the information he sought, Stanley quickly became hostile, aggressive, verbally abusive, and threatening. Contrary to his assertion on appeal, Stanley's messages were not merely a desire for or a prediction of violence. He messaged Much:

> *Something bad is going to happen.* I won't stand by and let you do this.[36]

> I don't know what to do anymore. [H]ow do [I] get out of this hell. [I] want to kill you people. *[I] want to strangle you with my bare hands until you are no longer breathing you fucking whore for what you've done to me. . . . [T]hings cannot continue on the path they are on or no one will be alive. . . . [Y]our time is coming.*[37]

---

[35] Kohonen, 192 Wn. App. at 571.

[36] Ex. 10 at 21.

[37] Id.

I'm gonna get my fucking revenge.[38]

Should [I] live up to your image of me. Should I fucking drag you bitches behind a fucking car and stomp on little bitch [Joey's] face till it's a fucking pancake. Huh, speak up bitch.[39]

Further, unlike the alleged victim in Kohonen, Much took Stanley's messages seriously and reported them to the police. And Stanley's admissions that he threatened to kill the women to "break [them] down,"[40] "increase their stress,"[41] and "scare"[42] them supports a reasonable inference that Stanley had the intent to intimidate the women.

Given the entire context, a reasonable person in Stanley's position would foresee that the statement, "I want to strangle you with my bare hands until you are no longer breathing you fucking whore for what you've done to me. . . . [Y]our time is coming"[43] would be interpreted by Much as a serious expression of intent to inflict death. We conclude the evidence was sufficient for a jury to find that Stanley made a true threat to kill Much as charged in count 6.

Likewise, the evidence was sufficient for a jury to find that Stanley made a true threat to kill Williams as charged in count 9. Stanley sent multiple messages to Williams over the course of a year and a half. The messages were abusive, calling her names and telling her that she deserved to rot in hell. Stanley told Williams, "I hope someone

---

[38] Id. at 24.

[39] Id. at 29.

[40] Pretrial Ex. 4 at 46.

[41] Id. at 74.

[42] Id.

[43] Ex. 10 at 21.

walks into your shitty bar and shoots you, fucking whore."[44]  Like the other victims, Stanley told Williams that she deserved to die, that he wanted to watch her die, and that he wanted to kill her.  Stanley also described Williams' motorcycle in the messages, causing her concern that he was following her.  Finally, on September 21, 2014, Stanley told Williams, "[Y]ou dumb fucking bitch.  [Y]ou['re] to[o] stupid to realize that you should never fuck with a schizophrenic.  *I'll make [you] famous bitch and send you to hell*."[45]

Considering all of Stanley's messages and the context in which they were made, a rational trier of fact could conclude that a reasonable person in Stanley's position would foresee that the statement, "I'll make [you] famous bitch and send you to hell," would be viewed by Williams as a serious expression of intent to inflict death.

While Stanley's messages to both women included pleas for help and self-serving statements about how he would never hurt anyone, the fact finder was not required to find these statements credible in light of Stanley's repeated vicious threats of violence.  After our independent review of the record, we conclude there was sufficient evidence that Stanley made true threats to kill Much and Williams as charged in counts six and nine under the objective reasonable person test.

### III. Cyberstalking Statute

Stanley argues the cyberstalking statute, RCW 9.61.260, is facially unconstitutional because it criminalizes First Amendment speech.  A statute is unconstitutionally overbroad on its face if it prohibits a substantial amount of protected

---

[44] Ex. 5 at 13.

[45] Id. at 27 (emphasis added).

speech.[46] But a statute that regulates behavior rather than purely speech will not be overturned unless the overbreadth is both real and substantial when compared to the statute's plainly legitimate sweep.[47]

Under RCW 9.61.260(1), a person may be convicted of cyberstalking if "with intent to harass, intimidate, torment, or embarrass any other person," the person "makes an electronic communication to such other person or a third party: (a) [u]sing any lewd, lascivious, indecent, or obscene words, images, or language, or suggesting the commission of any lewd or lascivious act," or "(c) [t]hreatening to inflict injury on the person . . . or any member of his or her family or household." Cyberstalking is a felony if the threat to injure is a threat to kill.[48] Stanley argues the statute is facially overbroad "to the extent that it criminalizes communications made with intent to 'harass' or 'embarrass.'"[49]

We reject his challenge that intent to "harass" is overbroad. The cyberstalking statute mirrors the telephone harassment statute, RCW 9.61.230,[50] which has been

---

[46] City of Seattle v. Huff, 111 Wn.2d 923, 925, 767 P.2d 572 (1989).

[47] City of Seattle v. Webster, 115 Wn.2d 635, 641, 802 P.2d 1333 (1990) (quoting Seattle v. Eze, 111 Wn.2d 22, 31, 759 P.2d 366 (1988)); see also Virginia v. Hicks, 539 U.S. 113, 122, 123 S. Ct. 2191, 156 L. Ed. 2d 148 (2003).

[48] Cyberstalking is a gross misdemeanor, but is elevated to a class C felony when "[t]he perpetrator engages in the behavior prohibited in subsection 1(c) of this section by threatening to kill the person threatened or any other person." RCW 9.61.260(3)(b).

[49] Appellant's Br. at 48.

[50] RCW 9.61.230 provides: "(1) Every person who, with intent to harass, intimidate, torment or embarrass any other person, shall make a telephone call to such other person: (a) Using any lewd, lascivious, profane, indecent, or obscene words or language, or suggesting the commission of any lewd or lascivious act; or (b) Anonymously or repeatedly or at an extremely inconvenient hour, whether or not conversation ensues; or (c) Threatening to inflict injury on the person or property of the

upheld against numerous constitutional challenges.[51]  Specifically, in State v.

Alexander, this court reevaluated the constitutional sweep of the term "harass" as used

in a municipal ordinance closely paralleling RCW 9.61.230 and held that the term does

not render the ordinance unconstitutionally overbroad.[52]  Noting that several other

decisions have rejected overbreadth challenges because the statutes in question

contained "a specific intent requirement [that] sufficiently narrowed the laws'

proscriptions," the Alexander court concluded that the mens rea element of the

telephone harassment statute defeated any First Amendment overbreadth challenge.[53]

Stanley nevertheless claims there is a distinction between telephonic and

electronic communication.  He argues "'[t]he gravamen of [telephone harassment] is the

thrusting of an offensive and unwanted communication upon one *who is unable to*

*ignore it*'" but the "cyberstalking statute is not so targeted" because "a recipient *is* able

---

person called or any member of his or her family or household; is guilty of a gross
misdemeanor, except as provided in subsection (2) of this section."

[51] See, e.g., City of Seattle v. Huff, 111 Wn.2d 923, 927-30, 767 P.2d 572 (1989)
(ordinance which prohibited telephonic threats of physical or property damage directed
to listener or member of listener's family made with intent to harass, intimidate, or
torment was not unconstitutionally overbroad or vague); State v. Alphonse, 147 Wn.
App. 891, 903-09, 197 P.3d 1211 (2008) (telephone harassment statute's prohibition
against use of "lewd, lascivious, profane, indecent, or obscene words or language" was
not unconstitutionally overbroad or unconstitutionally vague as applied to defendant's
conduct); State v. Alexander, 76 Wn. App. 830, 888 P.2d 175 (1995); State v. Dyson, 74
Wn. App. 237, 244-45, 872 P.2d 1115 (1994).

[52] 76 Wn. App. 830, 836, 888 P.2d 175 (1995); see also Alphonse, 147 Wn. App.
at 900; Huff, 111 Wn.2d at 928.

[53] Alexander, 76 Wn. App. at 836; see also Alphonse, 147 Wn. App. at 901-02
(recognizing that the telephone harassment statute "'regulates conduct implicating
speech, not speech itself' by requiring an intent to harass, intimidate, torment, or
embarrass when the speech is uttered'" (quoting Dyson, 74 Wn. App. at 243)).

to ignore an electronic communication."[54] Stanley's argument is not compelling. A recipient of a telephone call can change their phone number or ignore the call just as readily as a recipient of an electronic message can cancel their Facebook or email account or ignore the message. Further, as the Alexander court noted, the focus of the statute "is on the caller and his or her intentions, not the effect the telephone call might have on the recipient."[55] And our Supreme Court "has recognized that substantial privacy interests, which the State may recognize and protect, are involved *when communication intrudes into the privacy of the home.*"[56]

> "The extent to which a state may regulate such expression is 'dependent upon a showing that substantial privacy interests [of others] are being *invaded in an essentially intolerable manner.*' . . . [T]he privacy interest of a listener *in the privacy of his home will be accorded greater protection, along with the commensurate restrictions on unwanted discourse,* than would be permitted in a public forum.[57]

In today's culture, where personal devices especially are omnipresent, the internet is arguably as intrusive as the telephone, providing a cyberstalker substantial access into the private space of a person emailed or messaged.[58]

---

[54] Reply Br. at 9-10 (second alteration added) (quoting Alexander, 76 Wn. App. at 837-38).

[55] Alexander, 76 Wn. App. at 838.

[56] Id. at 837.

[57] Id. (emphasis added) (quoting People v. Taravella, 133 Mich. App. 515, 519, 350 N.W.2d 780 (1984).

[58] See generally Michael Barrett Zimmerman, *One-Off & Off-Hand: Developing an Appropriate Course of Liability in Threatening Online Mass Communication Events*, 32 CARDOZO ARTS & ENT. L.J. 1027 (2014); Nichole Galusha-Troicke, *Gone Are the Days of Stalking by Rotary Phones: H.B. 2549 Amending Arizona Stalking Statutes*, 6 PHOENIX L. REV. 797 (2013); Amy C. Radosevich, *Thwarting the Stalker: Are Anti-Stalking Measures Keeping Pace with Today's Stalker?*, 2000 U. ILL. L. REV. 1371 (2000).

Citing to the dictionary definition of "harass," Stanley argues that sending an indecent or lewd electronic communication with the intent to "annoy or bother someone in a repeated way" cannot be criminalized under the First Amendment.[59] But the only authority Stanley cites for that proposition is City of Everett v. Moore.[60] As the Alexander court explained, the ordinance at issue in Moore was unconstitutionally overbroad because it prohibited any written or telephonic communication "'likely to cause annoyance or alarm.'"[61] Not only did the ordinance focus solely on the perceptions of the recipient but words like "annoyance" and "alarm" proscribed a large amount of innocuous speech.[62] In contrast, the intent to harass element of the telephone harassment statute "proscribes only speech that is *intended to abuse* the listener."[63] Because the intent to harass element of the cyberstalking statute likewise proscribes only speech that is intended to abuse the listener, Stanley's argument fails.

Stanley also argues that the terms "harass" and "indecent" as used in the cyberstalking statute are unconstitutionally vague. He argues that because these terms "have a wide array of definitions," "it is not clear what conduct is prohibited."[64] Stanley further argues this encourages arbitrary enforcement.

This court analyzes vagueness claims under the Fourteenth Amendment due process test, which requires the challenger to demonstrate beyond a reasonable doubt

---

[59] Appellant's Br. at 51.

[60] 37 Wn. App. 862, 683 P.2d 617 (1984).

[61] Alexander, 76 Wn. App. at 838 (quoting id. at 863).

[62] Id.

[63] Id. at 838 (emphasis added).

[64] Reply Br. at 8.

that the statute either (1) fails to sufficiently define the offense so that ordinary people can understand what conduct is proscribed, or (2) fails to provide ascertainable standards of guilt to protect against arbitrary enforcement.[65]

"Determining whether a statute sufficiently defines an offense 'does not demand impossible standards of specificity or absolute agreement.'"[66] "For a statute to be unconstitutional, its terms must be 'so loose and obscure that they cannot be clearly applied in any context.'"[67] "Where, as here, the statute requires proof of specific criminal intent, the remaining terms are less vague or indefinite than they might otherwise be considered."[68]

"Courts usually scrutinize allegedly vague statutory language in the context of the entire statute and in light of common understanding, dictionary definitions, and common sense."[69] "Our courts have . . . commonly defined the term[ ] "indecent" as "'not decent . . . altogether unbecoming: contrary to what the nature of things for which circumstances would dictate as right or expected or appropriate: hardly suitable: unseemly.'"[70] "Harass" means "to vex, trouble, or annoy continually or chronically."[71]

---

[65] Dyson, 74 Wn. App. at 246.

[66] Alphonse, 147 Wn. App. at 907 (quoting City of Spokane v. Douglass, 115 Wn.2d 171, 179, 795 P.2d 693 (1990)).

[67] Id. (internal quotation marks omitted) (quoting Douglass, 115 Wn.2d at 182 n.7).

[68] State v. Stark, 66 Wn. App. 423, 434, 832 P.2d 109 (1992).

[69] Alexander, 76 Wn. App. at 841.

[70] Alphonse, 147 Wn. App. at 908 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1147 (1993)) (citing State v. Lansdowne, 111 Wn. App. 882, 891-92, 46 P.3d 836 (2002)).

[71] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1031 (2002).

In City of Seattle v. Huff,[72] Huff argued that a municipal ordinance[73] prohibiting telephonic threats of physical injury or property damage directed to a listener or a member of the listener's family made with the intent to "harass, intimidate," or "torment," was unconstitutionally vague.[74] Our Supreme Court disagreed. The court explained, "The ordinance provides adequate notice to persons of common understanding as to the specific intent, the type of threat, and the person(s) to whom the threat must be directed. For these reasons we also find the ordinance provides adequate standards to prevent arbitrary enforcement."[75]

Similarly, in State v. Alphonse, this court rejected the defendant's argument that the telephone harassment statute's prohibition against the use of "lewd, lascivious, profane, indecent, or obscene words or language" was unconstitutionally vague as applied to the defendant.[76] The defendant claimed that "because some of the words he used may be deemed by some to be 'indecent,' 'lewd,' or 'lascivious' but may be commonly used by others, a person must guess whether using these words would constitute criminal conduct."[77] The court explained that the statute contained a specific intent element, which dispelled any vagueness concerns, and the defendant used

---

[72] 111 Wn.2d 923, 767 P.2d 572 (1989).

[73] "'A person is guilty of making telephone calls to harass, intimidate, torment or embarrass any other person if, with intent to harass, intimidate, torment or embarrass any other person, he makes a telephone call to such other person: . . . 3. Threatening to inflict injury on the person or property of the person called or any member of his family.'" Id. at 924 (quoting SMC 12A.06.100(A)(3)).

[74] Id. at 929.

[75] Id. at 930.

[76] 147 Wn. App. 891, 907-08, 197 P.3d 1211 (2008).

[77] Id. at 908.

obscene language specifically to offend, humiliate, or torment the victim.[78] Thus, "[h]is claim that he was unsure whether using such language fell within the statutory prohibitions [was] neither logical nor credible."[79] Additionally, the defendant failed "to demonstrate how protected speech will be subject to an inordinate amount of police discretion when the State may only charge those complaints that are made with criminal intent."[80] The court concluded, "Because it includes an intent element, RCW 9.61.230 defines the proscribed conduct in reference to the caller, not the recipient, and thereby contains sufficient guidelines to prevent arbitrary enforcement."[81]

The cyberstalking statute similarly requires the defendant's intent to "harass, intimidate, [or] torment" another in connection with certain conduct.[82] In this context, the terms "harass" and "indecent" are specific enough that persons of common intelligence can ascertain when their intent falls within the statute's prohibitions. For the same reasons, the statute provides sufficient standards to prevent arbitrary enforcement.

We conclude that Stanley fails to meet his burden of demonstrating that the terms "harass" and "indecent" as used in the cyberstalking statute are unconstitutionally vague.[83]

We separately address Stanley's constitutional challenges to the "intent to embarrass" provision of the cyberstalking statute. We are troubled by the breadth of the

---

[78] Id.

[79] Id.

[80] Id. at 909.

[81] Id. at 909 (citing Alexander, 76 Wn. App. at 842-43).

[82] RCW 9.61.230.

[83] See Huff, 111 Wn.2d at 930.

intent to embarrass portion of the cyberstalking statute. Although the telephone harassment statute cases have held that the intent to embarrass is not unconstitutionally overbroad,[84] contemporary electronic communication, social media, and internet postings are broad in scope. A variety of political and social commentary, including caustic criticism of public figures, may be swept up as an intent to embarrass someone while using rough language. Stanley's opening brief was filed prior to our Supreme Court's decision in Trey-M. He emphasized the true threat issue. The briefs contain a limited discussion of free speech in the context of electronic communications with an intent to embarrass. In view of the limited briefing, we do not decide whether the intent to embarrass in the cyberstalking statute renders the statute unconstitutionally overbroad. Even assuming the term is unconstitutionally overbroad, any error is harmless beyond a reasonable doubt in this setting.

A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury could have reached the same result in the absence of the error.[85] "'Constitutional error is presumed to be prejudicial and the State bears the burden of proving that the error was harmless.'"[86]

> "An instructional error is presumed to have been prejudicial unless it affirmatively appears that it was harmless. 'A harmless error is an error which is *trivial*, or *formal*, or *merely academic*, and was not prejudicial to the substantial rights of the party assigning it, and *in no way affected the outcome of the case.*'"[87]

---

[84] Alexander, 76 Wn. App. at 834-36 (held the term "to embarrass" as used in RCW 9.61.230 did not render the statute unconstitutionally overbroad); Alphonse, 147 Wn. App. at 900.

[85] City of Bellevue v. Lorang, 140 Wn.2d 19, 32, 992 P.2d 496 (2000).

[86] Id. (quoting State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985)).

[87] Id. (quoting State v. Smith, 131 Wn.2d 258, 263-64, 930 P.2d 917 (1997)).

Stanley was charged with and the jury was instructed only on the felony charge of threats to kill. The jury was not instructed on the "lewd, lascivious, indecent, or obscene" subsection of the statute. While the jury was instructed on the intent "to harass, intimidate, torment, or embarrass," a conviction required the jury to find Stanley "threatened to kill" his victims.[88] Especially in light of Stanley's admissions that he harassed and threatened to kill the women[89] to "break [them] down,"[90] "increase their stress," and "scare"[91] them, no reasonable jury would conclude that Stanley's intent in privately messaging the women was to "embarrass" them with threats to kill. Therefore, even assuming the intent to embarrass portion of the cyberstalking statute is overbroad, the State has met its burden of showing beyond a reasonable doubt that a jury would have convicted Stanley with or without an intent to embarrass instruction. For the same reason, even assuming intent to embarrass is unconstitutionally vague, any error was harmless beyond a reasonable doubt.

*IV. Closing Argument*

Stanley contends the prosecutor committed two instances of misconduct during closing argument. We disagree.

To prevail on a claim of prosecutorial misconduct, the defendant must show that the prosecutor's conduct was both improper and prejudicial.[92] This court determines if

---

[88] See CP at 160-73; RCW 9.61.260.

[89] Ex. 10 at 21; Ex. 4 at 49-50, 61.

[90] Pretrial Ex. 4 at 46.

[91] Id. at 47.

[92] State v. Weber, 159 Wn.2d 252, 270, 149 P.3d 646 (2006).

the defendant was prejudiced under one of two standards of review.[93] If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.[94] If the defendant did not object at trial, the issue is waived unless the "prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice."[95] Under this heightened standard, the defendant must show that (1) "'no curative instruction would have obviated any prejudicial effect on the jury'" and (2) the misconduct resulted in prejudice that "'had a substantial likelihood of affecting the jury verdict.'"[96]

Stanley contends, and the State concedes, that the prosecutor misstated one fact in closing argument: that Much received messages from Stanley "after she returned from Spain."[97] Stanley objected, and the trial court overruled the objection. While it is improper for prosecutors to argue facts not in evidence,[98] Stanley fails to establish prejudice. Stanley contends "the wrongful overruling of this objection" prejudiced him "because the judge denigrated him in the eyes of the jury."[99] But immediately after overruling the objection, the judge stated, "Whether or not the facts are correct is

---

[93] State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

[94] Id.

[95] Id. at 760-61.

[96] Id. at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

[97] RP (July 30, 2015) at 1139. All of the messages Stanley sent to Much were received by her in Washington before she left for Spain.

[98] State v. Turner, 167 Wn. App. 871, 882, 275 P.3d 356 (2012).

[99] Reply Br. at 13.

something that the jury will decide," and "Mr. Stanley, if there is something that you want to point out in your closing, that you think was wrongly stated, you are welcome to do that."[100] The judge did not denigrate Stanley before the jury.

Stanley also contends the State misstated the law and shifted the burden of proof when the prosecutor told the jury "my burden to prove elements beyond a reasonable doubt only applies to the elements, only applies to your to convict instructions."[101] Stanley contends the prosecutor's argument suggests that the State did not need to prove a true threat beyond a reasonable doubt. But the true threat requirement merely defines and limits the scope of the essential threat element in the cyberstalking statute and is not itself an essential element of the crime that must be included in the to convict instruction.[102] Moreover, Stanley did not object at trial and does not establish that any prejudice could not have been cured by a curative instruction.[103]

Therefore, Stanley's prosecutorial misconduct claims fail.

### V. Statement of Additional Grounds

Stanley filed a pro se statement of additional grounds in which he raises various issues. Several issues echo those already raised in his brief and addressed in this opinion; notably, whether Washington applies an objective rather than subjective intent to threaten in determining what constitutes a true threat and whether the State presented sufficient evidence that he made true threats to kill. Many of his challenges

---

[100] RP (July 30, 2015) at 1139.

[101] Id. at 1136.

[102] State v. Allen, 176 Wn.2d 611, 626-30, 294 P.3d 679 (2013).

[103] See Emery, 174 Wn.2d at 760-61.

pertain to the credibility of witnesses and the persuasiveness of the evidence and are not subject to review on appeal.[104]

Stanley raises several challenges to the admissibility of evidence, including the admissibility of statements made to Detective Christensen, the admission of jail phone calls, and the suppression of an alleged incident involving a bartender who was friends with the four women. He ignores that "[d]ecisions involving evidentiary issues lie largely within the sound discretion of the trial court."[105] Stanley also raises several other issues related to the court's discretionary rulings, including rulings on motions in limine and rulings on calling subpoenaed witnesses after Stanley released them. But he fails to establish that any of the challenged rulings were unreasonable or based on untenable grounds.[106]

Stanley makes several prosecutorial misconduct claims. Where a defendant fails to object to the challenged conduct, he must show that the conduct was so flagrant and ill intentioned that a jury instruction could not have cured any resulting prejudice.[107] Stanley fails to make such a showing here.

Stanley contends the trial judge exhibited bias. "'An appearance of fairness claim requires proof of actual or potential bias. Mere speculation is not enough.

---

[104] State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 970 (1990) (matters pertaining to the credibility of witnesses, conflicting testimony, and the persuasiveness of the evidence are the exclusive province of the jury).

[105] State v. Nava, 177 Wn. App. 272, 289, 311 P.3d 83 (2013).

[106] See Falk v. Keene Corp., 53 Wn. App. 238, 247, 767 P.2d 576 (1989).

[107] State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994).

Furthermore, we presume a judge performs his or her duties without prejudice.'"[108] Stanley fails to establish actual or potential bias.

Stanley contends his convictions violate the merger clause. He argues that "the most that should have been charged is 4 counts, one for each victim."[109] The merger doctrine applies where the legislature has clearly indicated that in order to prove a particular degree of crime, the State must prove not only that the defendant committed that crime but that the crime was accompanied by an act defined as a crime elsewhere in the criminal statutes.[110] Cyberstalking is not a crime separated into degrees, and cyberstalking does not require proof of another crime. Stanley makes no showing that the merger doctrine applies.

Stanley also contends the accumulation of errors in this case require a new trial. Multiple errors may justify reversal even if the errors individually do not warrant reversal.[111] But because Stanley has failed to establish any errors, the cumulative error doctrine does not apply.

---

[108] State v. Afeworki, 189 Wn. App. 327, 356, 358 P.3d 1186 (2015) (quoting State v. Harris, 123 Wn. App. 906, 914, 99 P.3d 902 (2004) abrogated on other grounds by State v. Hughes, 154 Wn.2d 118, 110 P.3d 192 (2005)), review denied, 184 Wn.2d 1036 (2016).

[109] Statement of Additional Grounds at 41.

[110] State v. Vladovic, 99 Wn.2d 413, 420-21, 662 P.2d 853 (1983); see also State v. Parmelee, 108 Wn. App. 702, 710, 32 P.3d 1029 (2001) (merger doctrine relevant only when a crime is elevated to a higher degree by proof of another crime proscribed elsewhere in the criminal code).

[111] State v. Coe, 101 Wn.2d 772, 789, 684 P.2d 668 (1984).

Most, if not all, of Stanley's remaining issues depend on facts that are not a part of the record on appeal.[112] If Stanley "wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition."[113]

Affirmed.

WE CONCUR:

_____

_____

_____

_____

---

[112] Specifically, information a potential witness might have provided, revocation of his release on DOSA, suggestions that additional investigation would have been productive, e.g., relationship of a bartender with King County officials, allegations of vindictive prosecution, speedy trial rulings.

[113] State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).